773 So.2d 7 (2000)
Rev. Dr. James ARMSTRONG, et al., Appellants,
v.
Katherine HARRIS, etc., et al., Appellees.
No. SC95223.
Supreme Court of Florida.
September 7, 2000.
Rehearing Denied December 5, 2000.
*9 Randall C. Berg, Jr., Peter M. Siegel, and JoNel Newman of the Florida Justice Institute, Inc., Miami, Florida, for Appellants.
Robert A. Butterworth, Attorney General, Louis F. Hubener, Assistant Attorney General, James A. Peters, Special Counsel, and Richard B. Martell, Assistant Attorney General, Tallahassee, Florida, for Appellees.
Tom Warner, Solicitor General of Florida, Tallahassee, Florida, on behalf of Robert A. Butterworth, Attorney General, and the State of Florida, and on behalf of Appellees Katherine Harris, et al.
SHAW, J.
We have on appeal a judgment certified by the district court to be of great public importance requiring immediate resolution by this Court. We have jurisdiction. Art. V, § 3(b)(5), Fla. Const.

I. FACTS
The Florida Legislature filed with the Florida Secretary of State ("Secretary") a joint resolution (No. 3505) of the House of Representatives of the Florida Legislature proposing an amendment to article I, section 17, Florida Constitution, relating to excessive punishments (May 5, 1998). The proposed amendment was designated Amendment No. 2. Dr. Armstrong and other citizens filed a petition for writ of mandamus in this Court challenging the validity of the proposed amendment (October 9), but the Court by a four-to-three vote declined to exercise jurisdiction "without prejudice to Armstrong to file an appropriate action in circuit court" (October 19).[1] Armstrong then filed a complaint in circuit court seeking mandamus, injunctive, and declaratory relief (October 20), and the court ruled thusly: It dismissed the claim for mandamus relief, denied injunctive relief, and withheld ruling on the claim for declaratory relief (October 26). Armstrong sought certiorari review in the district court (October 26); that court certified the issue to this Court (October 28). On the day preceding the general election, this Court unanimously dismissed the appeal for technical reasons, without prejudice (November 2).[2] Voters at the general *10 election approved the amendment (November 3).
Armstrong filed a motion in this Court asking the Court to remand the case to the district court (November 11). He then filed in circuit court the present amended petition claiming that the ballot title and summary are inaccurate and again seeking mandamus, injunctive, and declaratory relief (December 3). The Secretary filed an answer in circuit court conceding that this claim is justiciable in an action for injunctive or declaratory relief[3] but asserting that the ballot title and summary are accurate (December 28). Armstrong sought summary judgment, contending that the ballot title and summary are misleading as a matter of law (January 4, 1999). The Secretary filed a cross-motion for summary judgment, arguing that the ballot title and summary are adequate (January 27). The circuit court's authority to decide the matter was not challenged or raised as an issue. This Court then issued an order formally remanding the case to the circuit court, without prejudice, to resolve the pending issues (February 2, 1999).[4] The circuit court reviewed the respective arguments in the summary judgment motions and granted summary judgment in favor of the Secretary, concluding that the Secretary's legal argument was more persuasive (February 25).[5] Armstrong appealed (March 15). The district court certified the case to this Court via "pass through" jurisdiction (March 31).[6]
Armstrong contends that both the ballot title and summary to Amendment No. 2 are defective for several reasons: They fail to disclose that the current prohibition against "cruel or unusual punishment" would be changed to "cruel and unusual punishment"; they give the false impression that the death penalty is in danger of being abolished and needs to be "preserved"; and they fail to give notice that the amendment would alter the separation of powers between the branches of government by giving the Legislature unfettered discretion to establish both the method of execution and the crimes susceptible to the death penalty.

II. STANDING
In her answer brief before this Court, the Secretary arguedas she did belowthat the ballot title and summary are accurate. She never argued or suggested that Armstrong lacks standing to pursue this action. Following oral argument *11 before this Court, the Secretary submitted a supplemental brief[7] in which she now contends that Armstrong cannot pursue this appeal because the general election already has taken place, the voters have approved the amendment, and Armstrong's action was dilatory. We disagree.
Article XI, section 5, Florida Constitution, contains a pre-election notice requirement which provides that a proposed constitutional amendment must be published in newspapers of general circulation throughout the state at both ten and six weeks prior to the election.[8] The purpose of this requirement is to avoid a "November surprise" in which voters are taken unawares in the voting booth by a proposed amendment. If citizens are given adequate pre-election notice, those who object to the substance of an amendment can voice their views in the public forum, and those who object to the regularity of the ballot title and summary can challenge the amendment in court.
Assuming that Armstrong received constructive notice of the present amendment in conformity with article XI, section 5, his failure to file the initial petition until several weeks later (i.e., three and a half weeks before the election) does not appear dilatory. Nothing in the record reveals that, prior to obtaining constructive notice, Armstrong, et al., constituted a formal political apparatus or an established special interest group with clear pre-publication knowledge of the amendment. Rather, appellants appear to be an ad hoc group of concerned citizens who, upon receiving notice, required a reasonable period of time in which to exercise their electoral prerogative-i.e., to meet and discuss the matter; to organize; to chart a course of action; to fund their organization, if necessary; to employ counsel; to research the issues, and to file suit. Given the pre-election publication schedule set forth in article XI, section 5, appellants filed their petition within a reasonable time after receiving constructive notice of the proposed amendment.

III. THE ACCURACY REQUIREMENT
A court may declare a proposed constitutional amendment invalid only if the record shows that the proposal is clearly and conclusively defective;[9] the standard of review for a pure question of law is de novo.[10] Proposed amendments to the Florida Constitution may originate in any of several sources, including the Legislature,[11] revision commission,[12] citizen initiative,[13] or constitutional convention.[14] *12 Regardless of source, a proposed amendment ultimately must be submitted to the electors for approval at the next general election. Article XI, section 5, Florida Constitution, states:
SECTION 5. Amendment or revision election.
(a) A proposed amendment to or revision of this constitution, or any part of it, shall be submitted to the electors at the next general election held more than ninety days after the joint resolution, initiative petition or report of revision commission, constitutional convention or taxation and budget reform commission proposing it is filed with the custodian of state records, unless, pursuant to law enacted by the affirmative vote of three-fourth of the membership of each house of the legislature and limited to a single amendment or revision, it is submitted at an earlier special election held more than ninety days after such filing.
Art. XI, § 5, Fla. Const. (emphasis added). Implicit in this provision is the requirement that the proposed amendment be accurately represented on the ballot; otherwise, voter approval would be a nullity.[15]
This accuracy requirement, which applies to all proposed constitutional amendments, has been codified by the Legislature in chapter 101, Florida Statutes (1997). Because the text of a proposed amendment oftentimes is detailed and lengthy, section 101.161 provides that only a title and brief summary of the amendment's "chief purpose" may be listed on the ballot. The actual text of the amendment does not appear:
101.161 Referenda; ballots.
(1) Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot after the list of candidates, followed by the word "yes" and also by the word "no," and shall be styled in such a manner that a "yes" vote will indicate approval of the proposal and a "no" vote will indicate rejection. The wording of the substance of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the joint resolution, constitutional revision commission proposal, constitutional convention proposal, taxation and budget reform commission proposal, or enabling resolution or ordinance. The substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.

§ 101.161(1), Fla. Stat. (1997) (emphasis added). Significantly, both the ballot title and summary are prepared by the amendment's sponsor.[16]
Because voters will not have the actual text of the amendment before them in the *13 voting booth when they enter their votes, the accuracy requirement is of paramount importance for the ballot title and summary:
As previously stated, section 101.161 requires that the ballot title and summary for a proposed constitutional amendment state in clear and unambiguous language the chief purpose of the measure. The requirement for proposed constitutional amendment ballots is the same as for all ballots, i.e.,
that the voter should not be misled and that he have an opportunity to know and be on notice as to the proposition on which he is to cast his vote.... All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide.... What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.

Askew v. Firestone, 421 So.2d 151, 154-55 (Fla.1982) (emphasis added). In practice, the accuracy requirement in article XI, section 5, functions as a kind of "truth in packaging" law for the ballot.

IV. LEGISLATIVELY PROPOSED AMENDMENTS
The Secretary in her supplemental brief argues that the Court should adopt a special standard for evaluating the validity of constitutional amendments proposed by the Legislature. She does not contend that all legislatively proposed amendments are automatically exempt from the accuracy requirement or that the courts have no authority to review such amendments. Rather, she claims that the accuracy requirement is applicable to legislatively proposed amendments only if a party can show conclusively that the Legislature engaged in fraud, deceit, or trickery.[17] We disagree.
Article XI, section 1, Florida Constitution, sets forth the procedure for amending the constitution via legislative resolution:
Section 1. Proposal by legislature. Amendment of a section or revision of one or more articles, or the whole, of this constitution may be proposed by joint resolution agreed to by three-fifths of the membership of each house of the legislature. The full text of the joint resolution and the vote of each member voting shall be entered on the journal of each house.
Art. XI, § 1, Fla. Const.
Although the constitution does not expressly authorize judicial review of amendments proposed by the Legislature,[18] this Court long ago explained that the courts *14 are the proper forum in which to litigate the validity of such amendments:
Under our system of constitutional government regulated by law, a determination of whether an amendment to the Constitution has been validly proposed and agreed to by the Legislature depends upon the fact of substantial compliance or noncompliance with the mandatory provisions of the existing Constitution as to how such amendments shall be proposed and agreed to, and such determination is necessarily required to be in a judicial forum where the Constitution provides no other means of authoritatively determining such questions.

Crawford v. Gilchrist, 64 Fla. 41, 50, 59 So. 963, 966 (1912) (emphasis added). This Court has reviewed legislatively proposed amendments throughout this century, and we have evaluated amendments' validity on various grounds, including ballot accuracy.[19]
In conducting this review, we traditionally have accorded a measure of deference to the Legislature:
Another thing we should keep in mind is that we are dealing with a constitutional democracy in which sovereignty resides in the people. It is their Constitution that we are construing. They have a right to change, abrogate or modify it in any manner they see fit so long as they keep within the confines of the Federal Constitution. The legislature which approved and submitted the proposed amendment took the same oath to protect and defend the Constitution that we did and our first duty is to uphold their action if there is any reasonable theory under which it can be done. This is the first rule we are required to observe when considering acts of the legislature and it is even more impelling when considering a proposed constitutional amendment which goes to the people for their approval or disapproval.
Gray v. Golden, 89 So.2d 785, 790 (Fla. 1956). This deference, however, is not boundless, for the constitution imposes strict minimum requirements that apply across-the-board to all constitutional amendments, including those arising in the Legislature.[20]
Several modern cases involving legislatively proposed amendments illustrate the applicability of the accuracy requirement in article XI, section 5. The Court in Smathers v. Smith, 338 So.2d 825 (Fla. *15 1976), reviewed a proposed amendment that gave the Legislature the power to nullify any administrative rule of any executive agency. Preliminarily, the Court noted the need for accuracy:
[L]awmakers who are asked to consider constitutional changes, and the people who are asked to approve them, must be able to comprehend the sweep of each proposal from a fair notification in the proposition itself that it is neither less nor more extensive than it appears to be.
Smathers, 338 So.2d at 829.[21] Recognizing the deference due legislative acts in general, the Court evaluated the amendment under an implicit "germaneness" theory and approved it, concluding that the proposed amendment was minimally germane to the provision it amended. The Court further ruled that the amendment comported with the requirements of section 101.161 and was not misleading.[22]
In Grose v. Firestone, 422 So.2d 303 (Fla.1982), the Court reviewed a legislatively proposed amendment that required courts to construe the Unreasonable Searches and Seizures Clause in the Florida Constitution in conformity with its federal counterpart. Again, the Court stressed the need for accuracy:
What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.
Grose, 422 So.2d at 305 (quoting Hill v. Milander, 72 So.2d 796, 798 (Fla.1954)) (emphasis omitted). The Court then conducted an analysis under section 101.161 and approved the amendment, concluding that "[t]he wording of the ballot summary of proposed Amendment 2 is unambiguous and clearly states the amendment's chief purpose."[23]
And finally, the Court in Askew v. Firestone, 421 So.2d 151 (Fla.1982), reviewed a legislatively proposed amendment that banned former legislators from lobbying for a two-year period after leaving office unless the legislator made full disclosure of his or her financial interests.[24] Again, the Court noted the need for accuracy on the ballot:
Simply put, the ballot must give the voter fair notice of the decision he must make.
Askew, 421 So.2d at 155. Although the ballot summary faithfully tracked the text of the proposed amendment, the summary failed to explain that the amendment would supersede an already existing constitutional provision that imposed an absolute two-year ban on lobbying by former legislators (i.e., regardless of financial disclosure). The Court concluded that the summary was misleading because it failed to tell voters that the amendment was intended to end the existing ban:
The problem ... lies not with what the summary says, but, rather, with what it does not say.
. . . .
If the legislature feels that the present prohibition against appearing before *16 one's former colleagues is wrong, it is appropriate for that body to pass a joint resolution and to ask the citizens to modify that prohibition. But such a change must stand on its own merits and not be disguised as something else. The purpose of section 101.161 is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment. A proposed amendment cannot fly under false colors; this one does. The burden of informing the public should not fall only on the press and opponents of the measurethe ballot title and summary must do this.

Askew, 421 So.2d at 156 (emphasis added). The Court struck the proposed amendment because it was misleading.
As these cases illustrate, the gist of the constitutional accuracy requirement is simple: A ballot title and summary cannot either "fly under false colors" or "hide the ball" as to the amendment's true effect. The applicability of this requirement also is simple: It applies across-the-board to all constitutional amendments, including those proposed by the Legislature.

V. THE PRESENT CASE
Pursuant to Florida's statutory scheme, the text of the proposed amendment in the present case did not appear on the ballot[25]; only the following language appeared:
NO. 2

CONSTITUTIONAL AMENDMENT ARTICLE 1, SECTION 17 (Legislative)
BALLOT TITLE: PRESERVATION OF THE DEATH PENALTY; UNITED STATES SUPREME COURT INTERPRETATION OF CRUEL AND UNUSUAL PUNISHMENT
BALLOT SUMMARY: Proposing an amendment to Section 17 of Article I of the State Constitution preserving the death penalty, and permitting any execution method unless prohibited by the Federal Constitution. Requires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment. Prohibits reduction of a death sentence based on invalidity of execution method, and provides for continued force of sentence. Provides for retroactive applicability.
Supervisor of Elections, Leon County, Fla., "Official Sample Ballot, 1998 General Election" 4 (Nov. 3, 1998). This ballot title and summary are deficient under article XI, section 5, for several reasons.

A. "Flying Under False Colors"
The ballot title and summary are misleading because the latter portion of the *17 title ("UNITED STATES SUPREME COURT INTERPRETATION OF CRUEL AND UNUSUAL PUNISHMENT") and the second sentence in the summary ("Requires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment.") imply that the amendment will promote the rights of Florida citizens through the rulings of the United States Supreme Court.
Florida's Cruel or Unusual Punishment Clause was adopted in 1838 by the Founding Fathers at the first constitutional convention in Port St. Joe and provided as follows:
That the great and essential principles of liberty and free government, may be recognized and established, we declare:
. . . .
12. That excessive bail shall in no case be required; nor shall excessive fines be imposed; nor shall cruel or unusual punishments be inflicted.

Art. 1, § 12, Fla. Const. of 1838 (emphasis added). The Clause has remained an integral part of our state constitution ever since and today provides:
Excessive punishments.Excessive fines, cruel or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden.

Art. 1, § 17, Fla. Const. Use of the word "or" instead of "and" in the Clause indicates that the framers intended that both alternatives (i.e., "cruel" and "unusual") were to be embraced individually and disjunctively within the Clause's proscription.[26]
This Court in Traylor v. State, 596 So.2d 957 (Fla.1992), explained that our system of constitutional government in Florida is grounded on a principle of "robust individualism" and that our state constitutional rights thus provide greater freedom from government intrusion into the lives of citizens than do their federal counterparts:
Federal and state bills of rights thus serve distinct but complementary purposes. The federal Bill of Rights facilitates political and philosophical homogeneity among the basically heterogeneous states by securing, as a uniform minimum, the highest common denominator of freedom that can prudently be administered throughout all fifty states. The state bills of rights, on the other hand, express the ultimate breadth of the common yearnings for freedom of each insular state population within our nation.
Id. at 962. In short: "[T]he federal Constitution... represents the floor for basic freedoms; the state constitution, the ceiling." Id.
In the present case, by changing the wording of the Cruel or Unusual Punishment Clause to become "Cruel and Unusual" and by requiring that our state Clause be interpreted in conformity with its federal counterpart, the proposed amendment effectively strikes the state Clause from the constitutional scheme. Under such a scenario, the organic law governing either cruel or unusual punishments in Florida would consist of a floor (i.e., the federal constitution) and nothing more. The Court in Traylor addressed precisely this scenario:
Under the federalist principles expressed above, where a proposed constitutional revision results in the loss or restriction of an independent fundamental state right, the loss must be made known to each participating voter at the time of the general election. Cf. People Against Tax Revenue Mismanagement v. County of Leon, 583 So.2d 1373, 1376 (Fla.1991) ("This is especially *18 true if the ballot language gives the appearance of creating new rights or protections, when the actual effect is to reduce or eliminate rights or protections already in existence.").
Traylor at 962-63 n. 5 (emphasis added). In the present case, a citizen could well have voted in favor of the proposed amendment thinking that he or she was protecting state constitutional rights when in fact the citizen was doing the exact opposite-i.e., he or she was voting to nullify those rights.[27]

B. "Hiding The Ball"
To conform to section 101.161(1), a ballot summary must state "the chief purpose" of the proposed amendment.[28] In evaluating an amendment's chief purpose, a court must look not to subjective criteria espoused by the amendment's sponsor but to objective criteria inherent in the amendment itself, such as the amendment's main effect.[29] In the present case, as explained above, the main effect of the amendment is simple, clear-cut, and beyond dispute: The amendment will nullify the Cruel or Unusual Punishment Clause. This effect far outstrips the stated purpose (i.e., to "preserve" the death penalty), for the amendment will nullify a longstanding constitutional provision that applies to all criminal punishments, not just the death penalty. Nowhere in the summary, however, is this effect mentioned-or even hinted at. The main effect of the amendment is not stated anywhere on the ballot. (The voter is not even told on the ballot that the word "or" in the Cruel or Unusual Punishment Clause will be changed to "and"[30]a significant change by itself.)

VI. POST-ELECTION INVALIDATION
The Secretary in her supplemental brief claims that Armstrong cannot proceed with this suit because the election already has taken place and voters have approved the amendment. The favorable vote of the electors, she contends, cleansed the amendment of any defect. We disagree.
Where a proposed constitutional amendment contains a defect in form, a vote of approval by the electorate may in some cases cleanse the amendment of the defect. This Court in Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892 (1944), stated the general rule:
[O]nce an amendment is duly proposed and is actually published and submitted to a vote of the people and by them adopted without any question having been raised prior to the election as to the method by which the amendment gets before them, the effect of a favorable *19 vote by the people is to cure defects in the form of the submission.
Sylvester, 154 Fla. at 669, 18 So.2d at 895.[31] This rule, however, is subject to a caveat: The defect in form must be technical and minor, which was the case in Sylvester:
[W]e are satisfied that if there was any irregularity in the form of the ballot with reference to the amendment now before us, it was not a serious one and was cured by the adoption of the amendment by the people at the General Election in November, 1942.
Sylvester, 154 Fla. at 669, 18 So.2d at 896 (emphasis added). Where the defect goes to the heart of the amendment, on the other hand, the flaw may be fatal.
In Wadhams v. Board of County Commissioners, 567 So.2d 414 (Fla.1990), the Board of County Commissioners of Sarasota County (the "Commissioners") sought to amend a provision of the county charter governing the Charter Review Board (the "Board"), which is charged with reviewing the charter on a regular basis and recommending changes directly to the people. The text of the proposed amendment was printed in full on the ballot and provided inter alia that the Board would meet every four years.[32] The Commissioners, however, neglected to mention on the ballot that the amendment would supersede an existing charter provision that allowed the Board to conduct unlimited meetings-i.e., the proposal was intended to curtail the Board's right to meet. The proposal *20 was approved by electors at a special election, and a group of citizens subsequently challenged the amendment's validity.
Both the trial and district courts approved the amendment; this Court quashed the district court decision. The Court flatly rejected the Commissioners' argument that even though the ballot did not explain the amendment's chief purpose, that information had been sufficiently disseminated via public hearings, pre-election publication, and other means:

The [Commissioners argue] that the majority in the decision below correctly concluded that there was no reason to invalidate the amendment[] based on voter confusion because the voters were afforded ample opportunity to become informed on the issue before the election by public hearings, advance publication of the proposal, and media publicity. We reject this argument. As this Court stated in Askew, "[t]he burden of informing the public should not fall only on the press and opponents of the measure the ballot ... summary must do this."
Wadhams, 567 So.2d at 417 (emphasis omitted).[33] The Court also rejected the Commissioners' argument that the voters' approval of the amendment cleansed it of any defect:
We also reject the [Commissioners'] argument that the favorable vote cured any defects in the form of the submission. This defect was more than form; it went to the very heart of what section 101.161(1) seeks to preclude. Moreover, it is untenable to state that the defect was cured because a majority of the voters voted in the affirmative on the proposed amendment when the defect is that the ballot did not adequately inform the electorate of the purpose and effect of the measure upon which they were casting their votes. No one can say with any certainty what the vote of the electorate would have been if the voting public had been given the whole truth, as mandated by the statute, and had been told "the chief purpose of the measure."
Wadhams, 567 So.2d at 417 (emphasis added).
And finally, the Court rejected the Commissioners' contention that the challenge should be rejected because it was filed too late:
Finally, we reject the [Commissioners'] argument that the present case is distinguishable from Askew because Askew dealt with a preelection challenge to the ballot and that the petitioners should be foreclosed from relief because the present action was not instituted until after the special election. The [Commissioners] in effect argue[] that hoodwinking the voting public is permissible unless the action is challenged prior to the election. We perceive no basis for the [Commissioners'] conclusion that the holding of this Court in Askew applies only if the challenge is made prior to the election. We agree with the dissent below that although there would come a point where laches would preclude an attack on the ordinance, such is not the situation in the present case where the suit was filed only a few weeks after the election.

Deception of the voting public is intolerable and should not be countenanced. The purpose of section 101.161(1) is to assure that the electorate is advised of the meaning and ramifications of the proposed amendment. Because the ballot at issue failed to comply with ... section 101.161(1), the proposed amendments must be stricken.
*21 Wadhams, 567 So.2d at 417-18 (emphasis added).
Like the ballot language in Wadhams, the ballot language in the present case is defective for what it does not say: It does not tell voters the "chief purpose" of the amendment. The present case, however, is even more compelling than Wadhams for several additional reasons. First, unlike the situation in Wadhams, the challenge here was initiated nearly a month before the election took place, rather than after the election. Second, unlike the situation in Wadhams, the text of the present amendment did not appear on the ballot, and the title and summary-which did appear-were misleading because they implied that the amendment would promote the rights of Florida citizens[34] and they contained several factual inaccuracies.[35]
Accordingly, we reaffirm our holding in Wadhams that a favorable popular vote standing alone does not confer automatic validity on a defective amendment. When a defect goes to the very heart of the amendment, as it did in both Wadhams and the present case, it is impossible to say with any certainty what the vote of the electorate would have been "if the voting public had been given the whole truth." Wadhams, 567 So.2d at 417. In such a case, the popular vote was based not on the whole truth but on part-truth.

VII. CONCLUSION
Although this Court traditionally has accorded a measure of deference to constitutional amendments proposed by the Legislature, our discretion is limited by the constitution itself. The accuracy requirement in article XI, section 5, imposes a strict minimum standard for ballot clarity. This requirement plays no favorites-it applies across-the-board to all constitutional amendments, including those proposed by the Legislature. The purpose of this requirement is above reproach-it is to ensure that each voter will cast a ballot based on the full truth. To function effectively-and to remain viable-a constitutional democracy must require no less.
Amendment No. 2 fails under article XI, section 5, for several reasons. First, the amendment "flies under false colors." Citizens may well have voted in favor of the amendment based on the false premise that the amendment will promote the basic rights of Florida citizens. Under such circumstances, the true merits of the amendment will have been overlooked or misconstrued. Second, the proposed amendment "hides the ball" from the voter. The ballot title and summary give no hint of the radical change in state constitutional law that the text actually foments.
It is beyond dispute that the amendment's main effect is to nullify a fundamental state right that has existed in the Declaration of Rights since this state's birth over a century and a half ago. This Court long ago noted the venerable role the Declaration of Rights (i.e., article I, sections 1-25, Florida Constitution) plays in our tripartite system of government in Florida:
It is significant that our Constitution thus commences by specifying those things which the state government must not do, before specifying certain things that it may do. These Declarations of Rights ... have cost much, and breathe the spirit of that sturdy and self-reliant philosophy of individualism which underlies and supports our entire system of government. No race of hothouse *22 plants could ever have produced and compelled the recognition of such a stalwart set of basic principles, and no such race can preserve them. They say to arbitrary and autocratic power, from whatever official quarter it may advance to invade these vital rights of personal liberty and private property, "Thus far shalt thou come, but no farther." They constitute a limitation upon the powers of each and all the departments of the state government. Thus no department, not even the legislative, has unlimited power under our system of government.
State ex rel. Davis v. City of Stuart, 97 Fla. 69, 102-03, 120 So. 335, 347 (1929). Courts must attend with special vigilance whenever the Declaration of Rights is in issue.[36]
Under our constitutional form of government in Florida, the Legislature is authorized to enact statutory laws and the courts can define the common law, but only the people-by direct vote-can delineate the organic law. The constitution is the one abiding voice of the body politic and encompasses the collective wisdom and counsel of our forebears, recorded verbatim throughout the ages. While any successive legislature is free to question the wisdom of the Founding Fathers and propose the striking of the Cruel or Unusual Punishment Clause, the Due Process Clause, the Right to Bear Arms Clause, the Freedom of Speech Clause, the Freedom of Religion Clause, or any other basic right enumerated in the Declaration of Rights, that legislature must do so plainly, in clear and certain terms. When Florida citizens are being called upon to nullify an original act of the Founding Fathers, each citizen is entitled-indeed, each is duty-bound-to cast a ballot with eyes wide open.
Based on the foregoing, we hold that proposed Amendment No. 2 clearly and conclusively violates the accuracy requirement in article XI, section 5, Florida Constitution. The ballot title and summary "fly under false colors" and "hide the ball" as to the amendment's true effect. Most important, voters were not told on the ballot that the amendment will nullify the Cruel or Unusual Punishment Clause, an integral part of the Declaration of Rights since our state's birth. Voters thus were not permitted to cast a ballot with eyes wide open on this issue. Because the validity of the electoral process was fundamentally compromised, we conclude that proposed Amendment No. 2 must be stricken.
It is so ordered.
HARDING, ANSTEAD and PARIENTE, JJ., concur.
HARDING, J., concurs specially with an opinion, in which PARIENTE, J., concurs.
PARIENTE, J., concurs specially with an opinion.
WELLS, C.J., and LEWIS and QUINCE, JJ., dissent with opinions.
HARDING, J., specially concurring.
I agree with the majority's conclusion that proposed Amendment No. 2 must be stricken because the ballot title and summary are inaccurate and misleading.
Article XI, section 5 of the Florida Constitution sets forth the procedures for submitting a proposed constitutional amendment to the electors for a vote. This section provides when a proposed amendment or revision to the constitution must be submitted to the voters,[37] the method for providing public notice of the proposed amendment or revision,[38] and when an approved amendment or revision becomes effective.[39] However, this section contains *23 no explicit requirements as to the language or wording of a proposed amendment. I agree with the majority that the constitutional requirement that a proposed amendment be submitted to the electors for approval contains an implicit requirement that the proposed amendment be accurately represented on the ballot; otherwise voter approval would be a nullity.
I reach this conclusion for two reasons: (1) the legislative intent expressed in section 101.161, Florida Statutes (1999), that the language of constitutional amendments and other public measures submitted to the vote of the people be clear and unambiguous; and (2) the long history of judicial review of ballots for clarity and lack of ambiguity.
In 1980, the Legislature amended section 101.161 to require that the substance of a constitutional amendment or other public measure submitted to the vote of the people be printed on the ballot in "clear and unambiguous language." See ch. 80-305, § 2, at 1342, Laws of Fla. Section 101.161 relates to "Referenda; ballots" and is contained in chapter 101, which governs "Voting Methods and Procedures." As amended by the legislature, section 101.161(1) provides that "[w]henever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language." (Emphasis added.) Nothing in subsection 1 limits this requirement to citizen-initiated amendments. In contrast, subsection 2 specifically pertains to "[t]he substance and ballot title of a constitutional amendment proposed by initiative." Id. Thus, I conclude that the standards of accuracy and clarity apply with equal force to all constitutional amendments and other public ballot measures, whatever the method by which they are initiated. I believe that section 101.161 was simply a codification of the implicit authority of Florida courts to review ballot measures for accuracy and clarity and a legislative statement that such clarity and accuracy is especially important when the voters are being asked to change the basic legal framework of the state. "Nothing in the government of this state or nation is more important than amending our state and federal constitutions. The law requires that before voting a citizen must be able to learn from the proposed question and explanation what the anticipated results will be." Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982) (Boyd, J., specially concurring).
However, long before the Legislature applied this requirement to constitutional amendment ballots, this Court held that all ballots must meet certain accuracy requirements. See Hill v. Milander, 72 So.2d 796 (Fla.1954) (addressing validity of ballot in city election). As this Court explained:
[T]he voter should not be misled and [should] have an opportunity to know and be on notice as to the proposition on which he is to cast his vote.... All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide.... What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.

Id. at 798 (emphasis added); accord Askew v. Firestone, 421 So.2d at 155 (applying same criteria to ballot containing legislatively proposed constitutional amendment). As explained in Smathers v. Smith, 338 So.2d 825, 829 (Fla.1976), this Court has historically reviewed proposed amendments to ensure that they meet "minimal requirements for clear expression." The Court has even struck down a legislatively proposed amendment on the basis that the ballot summary was misleading. See Askew v. Firestone. Moreover, this Court has certainly scrutinized other legislatively proposed amendments on this basis. See Grose v. Firestone, 422 So.2d 303 (Fla. 1982) (finding no violation of the ballot accuracy requirement in a legislatively proposed amendment requiring courts to *24 interpret Florida's constitutional guarantee to be free from unreasonable searches and seizures in conformity with the federal constitutional counterpart); Rivera-Cruz v. Gray, 104 So.2d 501 (Fla.1958) (finding that legislatively proposed amendment was actually improper "daisy chain" revision of entire Constitution); Sylvester v. Tindall, 154 Fla. 663, 668, 18 So.2d 892, 895 (1944) (stating that "the form of the ballot pertaining to [the legislatively proposed] amendment [creating the Game and Fresh Water Fish Commission] was sufficient to put the electorate on notice as to the amendment they were voting upon").
While this Court's review is implicit in the Constitution and legislatively endorsed, I agree that the Court, as explained in Smith, has a more "limited role in reviewing constitutional proposals which have been adopted by the Legislature for direct submission to the people." 338 So.2d at 826. However, in Smith, this Court did review the legislatively proposed amendment and determined that because there was doubt as to whether the Legislature violated the "strictures on their amendatory powers," the legislative action must be sustained. Id. at 827.
Chief Justice Wells suggests that the ballot box, and not judicial review, is the proper remedy for a legislatively proposed constitutional amendment. See dissenting op. at 29 (Wells, C.J., dissenting). I do not believe this is an adequate remedy where the voters are not clearly informed as to the effect of the amendment they have endorsed. Voting legislators out of office will not remove from the Constitution an amendment that was passed because of a misleading ballot summary. Instead, the proper and most expedient remedy is to strike a proposed constitutional amendment where "the record ... show[s] that the proposal is clearly and conclusively defective." Askew v. Firestone, 421 So.2d at 154.
Nor do I believe that a legislatively proposed amendment would necessarily supersede a prior legislative enactment with which it did not comply. See dissenting op. at 29 (Wells, C. J., dissenting). I would agree that a constitutional amendment would supersede a prior statute dealing with the same subject matter. For example, if the instant proposed amendment related to the accuracy requirements of ballot summary and titles, then it would supersede section 101.161(1). In the instant case, however, the proposed amendment does not deal with the same subject matter as section 101.161. Therefore, the proposed amendment would not supersede section 101.161.
For these reasons and those expressed in the majority opinion, I conclude that the instant challenge is properly before this Court and that Amendment No. 2 should be stricken because the ballot title and summary are misleading.
PARIENTE, J., concurs.
PARIENTE, J., specially concurring.
I agree with the majority that the accuracy requirement of article XI, section 5 "applies across-the-board to all constitutional amendments, including those proposed by the Legislature." (Majority op. at 21; see also majority op. at 14, 16). I further agree with the majority that in this case, neither the ballot title nor the summary complies with the accuracy requirements that are vital for the constitutional amendment process to function fairly. When a constitutional amendment changes the wording of a basic state constitutional right, the electorate must be clearly advised of that change.
As for the question of the timeliness of the petitioners' challenge, it is disconcerting to me that the striking of this amendment comes after the election.[40] However, *25 when the petitioners first filed their petition for writ of mandamus before the election, we declined to exercise jurisdiction by order issued on October 19, 1998. Our order declining jurisdiction stated that our decision was "without prejudice to Armstrong to file an appropriate action in circuit court." I joined in the majority opinion at that time. If there had been any question that the petitioners would be unable to challenge the amendment after the election, I would have joined with the dissenters in a decision to strike the amendment from the ballot at the time of the petitioners' pre-election challenge.[41] Further, as pointed out both by the majority and by Justice Harding's specially concurring opinion, to deny the petitioners' challenge at this time because the election has already taken place would be a departure from both the precedent and practice of this Court.
Indeed, no party to this action questioned the petitioners' right to file the challenge after the election until after oral argument was held, when the Secretary of State filed a supplemental brief belatedly contending that Armstrong could not pursue this appeal because the general election had taken place, the voters had approved the election and the petitioners' actions were dilatory. While we always have the ability to address jurisdictional issues, any claim that the challenge was barred by laches or the dilatory actions of the petitioners should have been raised in the circuit court and not in this Court after oral argument. Moreover, there has been no evidence in this case that the timing and posture of the challenge was a ploy or that it was the result of any type of legal maneuvering.
Although I recognize that we have the obligation to review this petition on the merits, I remain very concerned with the fact that currently no time limits or established procedures exist for a challenge to the ballot title and summary for legislatively approved constitutional amendments. I cannot fault the petitioners in this case with the manner by which they challenged the amendment,[42] but I wholeheartedly agree with Justice Overton's concerns expressed nearly twenty years' ago that "the public is being denied the opportunity to vote because no process has been established to correct misleading ballot *26 language in sufficient time to change the language." Askew v. Firestone, 421 So.2d 151, 157 (Fla.1982) (Overton, J., concurring specially). Thus, I join Justice Overton's repeated calls for the Legislature and this Court to "devise a process whereby misleading language can be challenged and corrected in sufficient time to allow a vote on the proposal." Id.; see also Advisory Op. to the Att'y Gen. re Tax Limitation, 644 So.2d 486, 497 (Fla.1994) (Overton, J., concurring specially); Florida League of Cities, 607 So.2d at 401-02 (Overton, J., dissenting); Evans v. Firestone, 457 So.2d 1351, 1356 (Fla.1984) (Overton, J. concurring). If the Legislature will not act to do so, then I believe it is incumbent on this Court to establish procedures for future challenges to constitutional amendments so that there is an adequate opportunity to correct inaccurate and misleading ballot titles and summaries before the election. The procedural history of this case clearly points out the necessity for developing such procedures for the future. I thus urge this Court to establish appropriate procedures, but conclude that any decision to establish such procedures must apply prospectively and should not affect the petitioners' challenge in this case.
WELLS, C.J., dissenting.
I have a fundamental difference with the majority concerning whether the Florida Constitution grants this Court the power to strike from the Constitution a constitutional amendment that the Legislature proposed and the voters approved based on a conclusion that the amendment's ballot title and summary were misleading.[43] This amendment was proposed in accord with the procedures set forth in article XI, section 1.[44] There is no assertion that those procedures were not followed when both houses of the Legislature voted unanimously to propose the amendment. The proposed amendment was placed on the ballot pursuant to article XI, section 5.[45] There is no assertion that procedures for submitting the amendment to the voters were not followed. The amendment was approved by well in excess of a majority of the electorate: 72.8 percent voted in favor of the amendment. I read no basis in the Constitution under these circumstances to find that this Court has the power to strike this amendment.
In order to find that it has this extraordinary power, the majority writes into article XI, section 5, an "accuracy requirement"[46] and then holds that the judicially-created requirement provides a basis for *27 this Court to review legislatively-proposed amendments to the Constitution. Language to support this is simply nonexistent in the express language of article XI, section 5. Next, relying upon the created language, the majority finds that this judicially-grafted requirement is breached by coming to the subjective conclusion that the ballot summary (also unmentioned in article XI, section 5) does not meet this requirement.
The majority cites Askew v. Firestone, 421 So.2d 151 (Fla.1982),[47] as precedent for the Court's striking from the ballot a legislatively proposed amendment on the basis that the Court concluded the ballot summary for the proposed amendment was misleading. The majority is correct that the Court did this in Askew. However, neither Askew nor the present majority opinion provide any analysis as to the constitutional basis of that power. Whereas, six years earlier, in dealing with the same section of the Constitution and with considerably more analysis, this Court in Smathers v. Smith, 338 So.2d 825 (Fla. 1976), had denied a request for such an exercise of power in respect to a legislatively proposed amendment. In Smith, this Court determined in an opinion written by Justice England that the Court had limited power of review in respect to a legislatively proposed amendment. The broad attack upon the proposed amendment rejected in Smith was similar to the attack the majority approves in this case:
Smith asserts several reasons why the proposed amendment is improper. He suggests that its language is unclear, its meaning obscure and its purpose too vague; that the Legislature lacks power to propose as a constitutional amendment a revision of governmental powers as sweeping and broad as he contends this amendment contains; that the amendment would violate the "one person one vote" guarantee of the Fourteenth Amendment of the United States Constitution; that the notice of the contents of the amendment which would appear on the ballot violates Section 101.161, Florida Statutes (1975); and that the amendment is inadequate to inform the public of the substantial shift in governmental power which it would effect. Smith also contends that the amendment in reality alters the separation of powers guaranteed in Article II, Section 3 of the Florida Constitution, in that it gives to the Legislature authority to exercise an interpretive power previously reposed exclusively in the judiciary.
The Attorney General, of course, refutes all of Smith's contentions, and further suggests that the defects alleged are in any event not the proper subject for judicial intervention at this stage. This admonition cannot be ignored, and we approach the subject matter of the case mindful of our limited role in reviewing constitutional proposals which have been adopted by the Legislature for direct submission to the people.

Another thing we should keep in mind is that we are dealing with a constitutional democracy in which sovereignty resides in the people. It is their Constitution that we are construing. They have a right to change, abrogate or modify it in any manner they see fit so long as they keep within the confines of the Federal Constitution. The legislature which approved and submitted the proposed amendment took the same oath to protect and defend the Constitution that we did and our first duty is to uphold their action if there is any reasonable theory under which it can be done. This is the first rule we are required to observe when considering acts of the legislature and it is even *28 more impelling when considering a proposed constitutional amendment which goes to the people for their approval or disapproval.
[Gray v. Golden, 89 So.2d 785, 790 (Fla. 1956).] It is in that framework that we limit our discussion to the critical issue which is here presented by the parties, and we rest our decision solely on the question of whether the amendment was proposed by the Legislature in conformity with Article XI, Section 1 of the Constitution. That section provides:
Amendment of a section or revision of one or more articles, or the whole, of this constitution may be proposed by joint resolution agreed to by three-fifths of the membership of each house of the legislature. The full text of the joint resolution and the vote of each member voting shall be entered on the journal of each house.
Because there is doubt as to whether the Legislature has violated what appear to be strictures on their amendatory powers, we are compelled to sustain this legislative action.

Smith, 338 So.2d at 826-27 (footnote omitted) (emphasis added). The Smith decision was thoroughly reviewed in a law review article written by James Bacchus,[48] who explained:
Justice England quoted this admonition at the outset in Smith [quoting Gray v. Golden, 89 So.2d at 790]. Undoubtedly, he sought to convey the court's awareness of the need for judicial restraint in reviewing the actions of the legislature. This was the framework the court used to justify its decision to limit the discussion in Smith to whether the proposed amendment complied with the procedures set forth in article XI, section 1. And this narrow notion of the judicial role in the amendatory process was mirrored in the Smith decision.
Id. at 769 (footnote omitted). The Bacchus article goes on to note the distinct power given to the Legislature in the amendatory process, which this Court had described earlier in Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963 (1912), and Collier v. Gray, 116 Fla. 845, 157 So. 40 (1934). Concerning article XI, section 1, Bacchus wrote:
Adopted in 1968, this provision resembles its counterpart in the 1885 constitution. To the extent that the two sections are identical, the judicial constructions of the 1885 provision should apply as well to article XI, section 1. Thus, the constitution clearly contemplates that proposed amendments shall be agreed to by a deliberate, final, and affirmative vote of the required members in each house. Likewise, procedural rules for acting on such proposals may be adopted and employed by each house if they are not in conflict with the constitution. Furthermore, the legislative power to propose constitutional changes includes the right to reconsider action taken on an amendment when no constitutional provision is violated.
The legislative authority in article XI is not limited in the same ways as the legislative authority in article III. The act of proposing constitutional amendments is not perceived as an ordinary legislative function. Such proposals are not subject to the constitutional provisions *29 regulating the introduction and passage of ordinary legislative enactments. For instance, "[t]he constitutional requirements that bills shall be read on different days or at different times do not apply." And, while a proposal to change the constitution may have a title, it is not required. Perhaps most important, the Governor's approval is not required.
Bacchus at 775-76 (footnote omitted) (quoting Collier, 116 Fla. at 857, 157 So. at 44). In Collier, this Court specifically stated:
While the procedure prescribed by the Constitution for proposals to amend the Constitution must be duly followed and none of the requisite steps may be omitted, yet unless the courts are satisfied that the Constitution has been violated in the submission of a proposed amendment they should uphold it.

116 Fla. at 857-58, 157 So. at 45 (emphasis added). Although the majority here first refers to article I, section 5, as having an "implicit accuracy requirement," the majority basically justifies its power to strike the constitutional amendment on the basis that the Legislature's ballot title and summary are misleading, in violation of section 101.161, Florida Statutes. I believe it is illogical and contradictory for the Court to conclude that a legislatively proposed amendment fails because it violates a statute. Obviously, a legislatively proposed amendment would supersede a prior legislative enactment with which it did not comply. I conclude that this is the very reason that this Court's precedent has historically required, in respect to legislatively proposed amendments, compliance with constitutionally mandated procedures but not statutory requirements. Collier, 116 Fla. at 857-58, 157 So. at 45.
Likewise, it is contrary to the separation of powers requirements of article II, section 3, for the Court to strike a provision from the Constitution because the Court concluded that the Legislature's presentation of the amendment to the voters was "misleading." This was the proper cautionary warning in this Court's 1956 opinion quoted in Smith, which stated:
[W]e should keep in mind that we are dealing with a constitutional democracy in which sovereignty resides in the people. It is their Constitution we are construing..... The legislature which approved and submitted the proposed amendment took the same oath to protect and defend the Constitution that we did and our first duty is to uphold their action if there is any reasonable theory under which it can be done.
Smith, 338 So.2d at 826-27 (quoting Gray, 89 So.2d at 790).
If the Legislature misled the voters, I conclude that the remedy is at the ballot box-not in the Court. There is simply no constitutional authority for a judicial veto of a legislatively proposed amendment, just as there is no gubernatorial veto. I believe it is crucial to always keep in mind that the very first sentence of article 1, section 1, of the Florida Constitution is, "All political power is inherent in the people." I do not find in article V, which is the article of the Constitution which provides to the Court its power, any basis to conclude that the people have given to the Court the power to intercede between the people and their elected representatives when the Legislature proposes amending the Constitution by the constitutionally required supermajority.
In respect to legislatively proposed amendments, I conclude that the supermajority requirement in the Constitution for the Legislature's placing a proposed amendment on the ballot is a constitutional intent for the legislative branch to perform its own review and censorship of what is to be placed before the people for a vote. This Court has previously acknowledged the distinction in the methods of amending the Constitution:
It is apparent that the authors of article XI realized that the initiative method did not provide a filtering legislative *30 process for the drafting of any specific proposed constitutional amendment or revision. The legislative, revision commission, and constitutional convention processes of sections 1, 2 and 4 all afford an opportunity for public hearing and debate not only on the proposal itself but also in the drafting of any constitutional proposal.
Fine v. Firestone, 448 So.2d 984, 988 (Fla. 1984).
My view is further bolstered by the express provision in the Constitution for this Court to review citizens' initiatives. The Constitution in article XI provides five methods of amending the Constitution: (1) proposal by Legislature, section 1; (2) revision commission, section 2; (3) initiative, section 3; (4) constitutional convention, section 4; and (5) taxation and budget reform commission, section 6. Only in respect to citizens' initiatives does the Constitution give to this Court express power to review amendments. Article V, section 3(b)(10), does provide, in respect to this method of amending the Constitution, that this Court
Shall, when requested by the attorney general pursuant to the provisions of section 10 of Article IV, render an advisory opinion of the justices, addressing issues as provided by general law.
Article IV, section 10, provides:
The attorney general shall, as directed by general law, request the opinion of the justices of the supreme court as to the validity of any initiative petition circulated pursuant to Section 3 of Article XI. The justices shall, subject to their rules of procedure, permit interested persons to be heard on the questions presented and shall render their written opinion expeditiously.
Article XI, section 3, pertains to citizen initiatives. In respect to amendments proposed by a constitutional revision commission or a constitutional convention or by the Legislature, the Constitution is silent as to any power given to the Court for review. Since the Constitution does not expressly give the Court this power, I must conclude that the Court should not assume it by implication. Rather, the Court should respect the distinctions between the methods of amending the Constitution which this Court acknowledged in Fine.[49] I agree with respondent that the exception to this would only be if there was evidence of fraud, which is clearly not present in this case.
Furthermore, I disagree with the majority's reliance upon Wadhams v. Board of County Commissioners, 567 So.2d 414 (Fla.1990). I find that case to be distinguishable because it did not involve a legislatively proposed amendment pursuant to article XI, section 1. Wadhams involved a proposal by a board of county commissioners to amend a county charter. I conclude that the rule to be applied in a case in which a legislatively proposed amendment has been approved by the voters was set forth by this Court in Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892 (1944):
While it is true that the procedure set forth in Section 1 of Art. XVII is mandatory and should be followed, this Court has recognized the almost universal rule that once an amendment is duly proposed and is actually published and submitted to a vote of the people and by them adopted without any question having been raised prior to the election as to the method by which the amendment gets before them, the effect of a favorable vote by the people is to cure defects in the form of the submission.
Id. at 669, 18 So.2d at 895 (citations omitted).
I recognize that petitioners sought to have this matter canceled from the ballot *31 by a late filing just prior to the election. However, the fact is that this attempt did not succeed. The voters approved the amendment by 72.8 percent of those voting. The majority's post-election analysis as to why the amendment so overwhelmingly succeeded is merely speculation and conjecture, which the rule provided in Sylvester correctly avoids. The record contains no data whatever to support a finding by the majority that the people were misled by an inaccurate ballot summary.
There is also the fact that the remedy here does not flow from any acceptable legal analysis of the remedies that the petitioners originally sought. The action was originally brought in this Court as a petition for writ of mandamus or, in the alternative, for injunctive relief or a declaratory judgment. The trial court correctly rejected the petitions for mandamus and injunctive relief but certified the issue to the district court of appeal as a declaratory judgment action. However, chapter 86, Florida Statutes (Declaratory Judgments), grants to circuit and county courts the jurisdiction to interpret statutes, county or municipal charters, ordinances, contracts, deeds, wills, franchises, or other articles, memoranda, or instruments in writing. See § 86.021, Fla. Stat. (1997). The statute does not mention legislatively proposed constitutional amendments. Mandamus did not lie because there was no clear legal right.
Finally, though in my view we do not reach the issue, I do not agree with the subjective conclusion of the majority that a unanimous Legislature "clearly and conclusively" misled Florida voters. Rather, I agree with the subjective conclusion of the trial judge that respondent's argument is more persuasive. I conclude that the ballot title and summary do inform that the state constitutional provision against cruel or unusual punishment is to be construed in accord with decisions of the United States Constitution. This is similar to the provision which voters of the state earlier adopted in respect to search and seizure in article I, section 12, which this Court upheld in Grose v. Firestone, 422 So.2d 303 (Fla.1982), and which the present majority does not and cannot adequately distinguish. Also, respondent is correct that it has never been determined that there is a material difference between the phrases "cruel or unusual" and "cruel and unusual" for purposes of the application of capital punishment. I find it to be a particularly strained interpretation where the majority construes that "legislative designation" eliminates a veto by the Governor. "Designated by the Legislature" is already in article X, section 17(b) of the Constitution without controversy. I believe it is significant that the record in this case contains nothing in the way of factual evidence to support the majority's subjective conclusion that misleading language misled the voters. Thus, even if I found in the Constitution the power to review legislatively-proposed amendments, I would not, on the basis of the present record, join in striking from the Constitution what the Legislature and the people themselves have put into the Constitution by such substantial votes.
For the foregoing reasons, the decision of the circuit court should be affirmed and the petitions denied.
LEWIS, J. dissenting.
Once again, the judicial system is being asked not only to intervene in a matter that addresses the intent and understanding of Florida voters in connection with the performance of the most basic function in the democratic process, but in so doing, to invalidate the result of a vote after the citizens of Florida have already exercised their franchise and voiced a decision. I am troubled that challenges to matters that are to be submitted to the people for determination fall victim to strategies that produce judicial reversals in matters that have already been submitted to the electorate, when any challenge or controversy could and should have been submitted for judicial determination in a timely manner, providing sufficient time for full *32 review and resolution prior to the day of decision for Florida voters. While I agree that much of the reasoning expressed by Justice Shaw is certainly intellectually arguable, my analysis of the legal maneuvering by the appellants here compels a different conclusion with regard to the issue of delay and laches. I must note that this is at least the third occasion within a very short period of time that a request, with very questionable timing, to invalidate action taken by voters has been submitted to this Court for resolution.[50]
First, it is clear that the power of the Legislature to propose amendments to the Florida Constitution arises from article XI, section 1, and submission of such proposed amendments to the electorate for consideration is addressed in article XI, section 5 of the Florida Constitution. Interestingly, the Florida Constitution does not contain a provision which describes the form in which the proposed amendment must be submitted to Florida citizens for consideration, nor is there any constitutional immunity for misleading or ambiguous titles or summaries of such amendments. Thus, the form in which the present issue appeared on the ballot finds no specific constitutional provision for its foundation and, therefore, has no constitutional basis. With this predicate, it seems clear that any alteration in the form of a proposed constitutional amendment as it will appear on a ballot for consideration by Florida citizens has its foundation in the judicial concept that our fundamental law requires that the form of a proposed amendment to the Constitution as it appears on the ballot be fair and advise the voters of sufficient information to permit intelligent voting. This is further codified through the intent expressed in section 101.161, Florida Statutes, which requires that public measures submitted to popular vote be clear and unambiguous.
Here, the form of the proposed amendment as it appeared on the ballot (which was represented to be a summary) was something other than a verbatim recitation of the actual amendment itself. Since that which was submitted to the voters was merely an interpretation of the amendment itself, I cannot accept the logic which suggests immunity from review with regard to that which is merely an interpretation of what the organic law will be. Therefore, I concur with the views of Justices Shaw and Harding with regard to the role of the judicial system in connection with proposed constitutional amendments.
I depart, however, from the views of my brothers and sisters in the majority, with regard to application of existing standards under the circumstances in this case with particular reference to the timing and sequence of events. Here, those who have challenged the validity of the proposed amendment took no action until less than thirty days prior to the general election, and then sought to circumvent multiple levels of the Florida judicial system by filing directly with this Court. As reflected in the majority opinion, (majority op. at 9), the challengers next sought mandamus, injunctive and declaratory relief in the circuit courtwhich dismissed the claim for mandamus, denied injunctive relief and withheld determination with regard to declaratory relief. As the files of this Court reflect, by October 28, 1998, the District Court of Appeal had certified to this Court review of the denial of injunctive relief as an issue of great public importance requiring immediate resolution. However, in the interim, the challengers had voluntarily dismissed all claims for injunctive and declaratory relief (majority op. at 10). The dismissal of both claims for injunctive relief and declaratory relief while the issue concerning injunctive relief was pending before this Court prior to the election terminated the judicial activity *33 and permitted the election to proceed. As recognized by this Court in Florida League of Cities v. Smith, 607 So.2d 397 (Fla.1992), the only remaining claim was for mandamus which had not been certified to this Court. Further, such remedy could not be used to establish the existence of the right asserted, but only to enforce a right already recognized by clear and certain established law. As recognized and stated in Florida League of Cities, where there is no clear law requiring a certain result and mere ministerial application of such law, a claim for mandamus relief cannot be used as the mechanism to create a controversy, to resolve the controversy and thereby establish the clear and certain legal right, all in the same proceeding in which mandamus is granted. Thus, in this case, the challengers themselves had taken strategic moves to eliminate review by this Court prior to the general election. It was this maneuvering and untimely challenge by the appellants that precluded full judicial review and resolution prior to the general election. It was not until after the general election had been completed and the results known that a claim for injunctive and declaratory relief was again submitted to the judicial system some thirty days after the election.
In my view, critical review and strict scrutiny of the ballot title and summary of a proposed amendment must be tempered and balanced with the interest of upholding the results of the democratic process and not depriving voters of their franchise by invalidating the decision made at the ballot box when those challenging the ballot language have failed to timely present the dispute to the judicial system so that it may be thoughtfully analyzed and carefully considered for a determination to be made prior to election day. These competing interests must, I suggest, be balanced under the circumstances in this case particularly when both the timing of the challenge and the ballot language are so very similar in concept to those considered and approved by this Court in Grose v. Firestone, 422 So.2d 303 (Fla.1982).
While I would never condone or support a legal analysis that would, in effect, permit the voting public to be "hoodwinked" or defrauded by application of the concept of laches or delay, I conclude that a far better approach here in balancing the respective interests is to analyze whether the asserted defects in the form of the submission to the voters are of such significance as to prohibit or prevent the legitimate expression of the intent of the people as evidenced through the favorable vote of the electorate. Misrepresentations and fraudulent behavior may never be cured by affirmative votes; however, I would not place the asserted ambiguity involved in this case in such category. With the summary here being very similar in concept to that approved in connection with a similar amendment proposed in Grose, I would apply the principle of law that, once an election has been concluded and the result determined, it is the duty of the judicial system to uphold that result, if possible, if the process has been essentially free and fair, the voters have not been essentially deprived of their right to vote due to the alleged defect, and the result has not been so tainted by irregularities as to suggest that the result is not the intent of the electorate. See, e.g., Winterfield v. Town of Palm Beach, 455 So.2d 359 (Fla.1984).
It is my view that if one perceives a ballot matter to be deficient with regard to adequate summaries or titles, it is essential that any challenge be instituted in a timely fashion, so that the entire review process by the courts can be completed before an election. This Court has noted in Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892 (1944), that, where it is contended only after the actual vote that the form of a ballot is not sufficient to properly advise the electorate as to what is being voted upon, the required publication and submission to a vote of the people of this State, and the adoption of such provision by the electorate, has the effect of curing minor defects in the form of submission. I *34 do not believe that an allegedly aggrieved party should be permitted to simply await the eve of an election and then challenge an asserted deficiency which could and should have been resolved prior to the election, if timely pursued.
Although there may be no particular statutory time provision or other specific rules of procedure applicable to the timing of challenges to matters that are to be submitted to the voting public, I believe that the doctrine of laches and delay must be applied here in the balancing of competing interests. If we do not require timely challenges, it is conceivable that parties could simply wait for a controversy to arise with regard to the interpretation of an amended constitutional provision and, if the ultimate judicial resolution of such dispute were contrary to the ballot summary as presented to Florida voters, seek to invalidate the amended section of the Constitution many years later. We must find some balance achieved between demanding integrity of ballot titles and summaries and supporting the integrity of the democratic process by upholding the results of general elections. I would join the suggestion of former Justice Overton that it is imperative that the Legislature and this Court develop rules and procedures by and through which challenges to ballot titles and summaries and challenges to other matters submitted for public vote can be timely and properly judicially reviewed, resolved, and any defects corrected, to allow the citizens of Florida to vote on a proper proposal and not suffer the consequences of lingering after-the-fact litigation.[51] I suggest that these types of challenges should be initiated in the trial court for full factual development with an expedited trial process followed by meaningful review with resolution of the issues concluded so that the matter could be submitted to the voting public at the time originally contemplated by our Constitution.
QUINCE, J., dissenting.
I agree with that portion of Chief Justice Wells' dissent wherein he concludes the Legislature did not mislead the Florida voters. The ballot title and summary are not misleading but do in fact inform the public that this state constitutional provision is to be construed in conformity with the United States constitutional provision on cruel or unusual punishment and in conformity with the United States Supreme Court decisions construing the federal provision. As Chief Justice Wells points out, this is the same type of provision approved by the people of Florida in regards to the search and seizure provision of our State constitution. See art. I, § 12, Fla. Const.; Grose v. Firestone, 422 So.2d 303 (Fla.1982).
Therefore, I would affirm the decision of the circuit court.
NOTES
[1] This Court's order stated in full: "We decline to exercise jurisdiction without prejudice to file an appropriate action in the circuit court." Armstrong v. Mortham, 727 So.2d 902 (Fla.1998) (unpublished order).
[2] This Court's order stated in full:

The Circuit Court of the Second Judicial Circuit in and for Leon County, Florida, by order dated October 26, 1998, dismissed appellants' claim for mandamus relief, denied injunctive relief, and withheld ruling on the claim for declaratory relief. A petition for writ of certiorari from the dismissal of the claim for mandamus relief was filed with the district court and treated as an appeal. By order dated October 28, 1998, the First District Court of Appeal certified to this Court the denial of injunctive relief as an issue of great public importance requiring immediate resolution. On October 27, 1998, the appellants voluntarily dismissed their counts for injunctive and declaratory relief.
Under the circumstances, we dismiss this appeal without prejudice.
No motion for rehearing will be entertained by the Court.
Armstrong v. Mortham, 719 So.2d 892 (Fla. 1998) (unpublished order).
[3] The Secretary averred the following in her Answer: She "[d]enied this [Circuit] Court has jurisdiction to issue a writ of mandamus under the circumstances at bar"; and she "[a]dmitted" that the court has authority to issue injunctive and declaratory relief in the case at bar.
[4] This Court's order stated in full: "We remand this case, without prejudice, to the Second Judicial Circuit for resolution of all issues that are pending in that court." Armstrong v. Mortham, No. 94,205 (Fla. order filed Feb. 2, 1999).
[5] The order stated in relevant part: "Suffice it to say that I find the argument advanced by the [the Secretary] to be more persuasive on each point and accordingly, it is ORDERED AND ADJUDGED that [Armstrong's] Motion for Summary Judgment is denied. [Armstrong's] Cross Motion for Summary Judgment is granted and Final Summary Judgment is hereby entered in favor of [the Secretary]."
[6] See Art. V., § 3(b)(5), Fla. Const. (stating that the Supreme Court "[m]ay review any order or judgment of a trial court certified by the district court of appeal in which an appeal is pending to be of great public importance, or to have a great effect on the proper administration of justice throughout the state, and certified to require immediate resolution by the supreme court").
[7] The brief was submitted by the Florida Solicitor General on behalf of the Secretary and others.
[8] Article XI, section 5, Florida Constitution, provides in relevant part:

(b) Once in the tenth week, and once in the sixth week immediately preceding the week in which the election is held, the proposed amendment or revision, with notice of the date of election at which it will be submitted to the electors, shall be published in one newspaper of general circulation in each county in which a newspaper is published.
[9] Askew v. Firestone, 421 So.2d 151, 154 (Fla. 1982).
[10] See, e.g., id. at 156 (applying a de novo standard of review to the trial court's order: "Nevertheless, it is clear and convincing to us that the ballot language ... is so misleading to the public ... that this remedial action must be taken."); see also Philip J. Padovano, Florida Appellate Practice 148 (2nd ed. 1997) ("Summary judgments present a classic example of the type of decisions that are subject to the de novo standard of review.").
[11] Article XI, section 1, Florida Constitution, provides:

Section 1. Proposal by legislature. Amendment of a section or revision of one or more articles, or the whole, of this constitution may be proposed by joint resolution agreed to by three-fifths of the membership of each house of the legislature. The full text of the joint resolution and the vote of each member voting shall be entered on the journal of each house.
[12] Art. XI, § 2, Fla. Const.
[13] Art. XI, § 3, Fla. Const.
[14] Art. XI, § 4, Fla. Const.
[15] See generally Askew, 421 So.2d at 155 ("[T]he Constitution requires ... that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot." (quoting Hill v. Milander, 72 So.2d 796, 798 (Fla.1954) (emphasis added))); Smathers v. Smith, 338 So.2d 825, 829 (Fla.1976) ("[L]awmakers who are asked to consider constitutional changes, and the people who are asked to approve them, must be able to comprehend the sweep of each proposal from a fair notification in the proposition itself that it is neither less nor more extensive than it appears to be."); Crawford v. Gilchrist, 64 Fla. 41, 54, 59 So. 963, 968 (1912) (noting that the "proposal of amendments to the Constitution is a highly important function of government, that should be performed with the greatest certainty, efficiency, care and deliberation"); see also James Bacchus, Legislative Efforts to Amend the Florida Constitution: The Implications of Smathers v. Smith, 5 Fla. St. U.L.Rev. 747(1977) (decrying the lack of adequate judicial control over legislatively proposed amendments and calling for adoption of an explicit accuracy requirement in article XI, section 1).
[16] See § 101.161(2), Fla. Stat. (1997).
[17] The Secretary argues: "Absent a conclusive demonstration that the manner in which the Legislature has prepared a ballot title and summary in a joint resolution demonstrates fraud, deceit or trickery in violation of the federal constitution or the fundamental constitutional political rights of the electorate, the courts must defer to the Legislature's determination that its ballot title and summary is valid."
[18] The constitution expressly authorizes judicial review of only those amendments proposed by citizen initiative. See Art. IV, § 10, Fla. Const.; see generally Art. V, § 3(10), Fla. Const.; Art XI, § 3, Fla. Const. (explaining that the sponsor of an initiative petition must obtain signatures of eight percent of electors statewide in order to place the amendment on the ballot); §§ 15.21 (explaining that judicial review may be sought when the sponsor has obtained one-tenth of the signatures necessary for placement on the ballot), 16.061, Fla. Stat. (1997). This provision was adopted in 1986 in response to the Court's striking of two initiative amendments from the ballot after the sponsors had obtained the requisite number of signatures for placement on the ballot. See Evans v. Firestone, 457 So.2d 1351 (Fla. 1984); Fine v. Firestone, 448 So.2d 984 (Fla. 1984). The purpose of this provision is to allow the Court to rule on the validity of an initiative petition before the sponsor goes to the considerable effort and expense of obtaining the required number of signatures for placement on the ballot. See William A. Buzzett & Deborah K. Kearney, Commentary (1986 House Joint Resolution 71), 26 Fla. Stat. Ann., Art. IV, § 10, Fla. Const. (West Supp. 2000). Obviously, no such provision is necessary for amendments originating from other sources.
[19] See, e.g., Grose v. Firestone, 422 So.2d 303 (Fla.1982) (finding no violation of the accuracy requirement in a legislatively proposed amendment requiring courts to interpret the Florida Unreasonable Searches and Seizures Clause in conformity with its federal counterpart); Askew v. Firestone, 421 So.2d 151 (Fla. 1982) (finding a violation of the accuracy requirement in a legislatively proposed amendment ending an absolute two-year ban on lobbying by former legislators); Smathers v. Smith, 338 So.2d 825 (Fla.1976) (finding no violation of either the "germaneness" doctrine or the accuracy requirement in a legislatively proposed amendment giving the Legislature the power to nullify administrative rules); Rivera-Cruz v. Gray, 104 So.2d 501 (Fla.1958) (finding that a legislatively proposed amendment revising the Preamble and every article in the constitution violated the then-current provision that limited an amendment to a single article); Gray v. Golden, 89 So.2d 785 (Fla.1956) (finding that a legislatively proposed amendment authorizing home rule for Dade County did not violate the single-article provision); Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892 (1944) (finding no violation of the accuracy requirement in a legislatively proposed amendment creating the Game and Fresh Water Fish Commission); Collier v. Gray, 116 Fla. 845, 157 So. 40 (1934) (finding that a legislatively proposed amendment delineating judicial circuits throughout the state could be voted upon by electors despite "a clerical misprision" in copying the resolution in the House journal); Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963 (1912) (finding that a legislatively proposed amendment was invalid because it was not signed by the presiding officer of the House or Senate and was never intended to function as an amendment).
[20] See, e.g., Smathers v. Smith, 338 So.2d 825, 829 (Fla.1976) ("With these minimal requirements for clear expression and locational specificity in mind, we turn to the proposal before us.").
[21] See also Smathers, 338 So.2d at 828 (referring to "the even more compelling notice-giving needs which legislators should have for constitutional amendments").
[22] See Smathers, 338 So.2d at 827 n. 2 ("We have considered all of the points raised by Smith [including his accuracy claim under section 101.161] and find that ... they are without merit....").
[23] Grose, 422 So.2d at 305.
[24] The ballot title and summary read as follows:

. . . .
If the legislature feels that the present prohibition against appearing before FINANCIAL DISCLOSURE REQUIRED BEFORE LOBBYING BY FORMER LEGISLATORS AND STATEWIDE ELECTED OFFICERS
Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests.
Askew, 421 So.2d at 153.
[25] The full text of the proposed amendment as it appears in Joint Resolution No. 3505 reads as follows:

FULL TEXT OF PROPOSED AMENDMENT:
SECTION 17. Excessive punishments. Excessive fines, cruel and or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden. The death penalty is an authorized punishment for capital crimes designated by the Legislature. The prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution. Any method of execution shall be allowed, unless prohibited by the United States Constitution. Methods of execution may be designated by the Legislature, and a change in any method of execution may be applied retroactively. A sentence of death shall not be reduced on the basis that a method of execution is invalid. In any case in which an execution method is declared invalid, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method. This section shall apply retroactively.
H.J.Res. 3505, Regular Session (Fla.1998) (words stricken are deletions; words underlined are additions).
[26] See, e.g., Allen v. State, 636 So.2d 494, 497 n. 5 (Fla.1994) ("Unlike the federal Constitution, the Florida Constitution prohibits `cruel or unusual punishment.'... This means that alternatives were intended."); Tillman v. State, 591 So.2d 167, 169 n. 7 (Fla.1991) ("The use of the word `or' indicates that alternatives were intended.").
[27] The Secretary points out that the Court in Grose v. Firestone, 422 So.2d 303 (Fla.1982) (addressing an amendment to the state Unreasonable Searches and Seizures Clause), upheld the ballot summary in another "conformity amendment" case. At that time, however, the conformity issue was one of first impression and the Court was asked to rule on short notice (i.e., the case was submitted to the Court less than a week before the general election) without extensive briefing by the parties. In the years following Grose, the issue has been widely debated and has been the focus of intensive and spirited discourse. See, e.g., Perez v. State, 620 So.2d 1256 (Fla. 1993); Bernie v. State, 524 So.2d 988 (Fla. 1988).
[28] See § 101.161(1), Fla. Stat. (1997) ("The substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.") (emphasis added).
[29] See, e.g., Evans v. Firestone, 457 So.2d 1351, 1355 (Fla.1984) ("The ballot summary should tell the voter the legal effect of the amendment ....") (emphasis added); Askew, 421 So.2d at 156 ("The purpose of section 101.161 is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment.") (emphasis added).
[30] The ballot summary simply states: "Requires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment." (Emphasis added.)
[31] See also State ex rel. Landis v. Thompson, 120 Fla. 860, 874-75, 163 So. 270, 276 (1935) ("[I]n ruling upon the validity of constitutional changes after the popular voice has been expressed in favorably voting upon such changes proposed in the form of constitutional amendments agreed to by the Legislature, the popular voice is the paramount act, and... mere formal or procedural irregularities in the framing, manner, or form of submission or balloting, will not be held fatal to the validity of such amendment after it has been actually agreed to by three-fifths vote of all the members elected to each House, and such amendment thereafter duly published submitted to and affirmatively approved by a majority vote of the electors cast thereon."). Cf. Collier v. Gray, 116 Fla. 845, 858, 157 So. 40, 45 (1934) ("The substance more than the form is to be regarded in considering whether the complete system prescribed by ... the Constitution for submitting proposals to amend the Constitution has been observed.").
[32] The ballot entry as reprinted in Wadhams read as follows:

OFFICIAL BALLOT SPECIAL ELECTION ON AMENDING ARTICLE II
SECTIONS 2.11.A AND 2.11.B OF THE SARASOTA COUNTY CHARTER NOVEMBER 6, 1984
Shall Article II, Sections 2.11.A and 2.11.B of the Sarasota County Charter be amended as proposed by Sarasota county Ordinance No. 84-72 to read:
"Section 2.11.A Composition, Election and Term of Members. There shall be a Charter Review Board which shall by 1984 be composed of ten (10) members who shall serve without compensation and who shall be elected in the following manner: five (5) members, one residing in each of the five County Commission districts, shall be elected by the voters of Sarasota County at the general election to be held in 1982, and every four (4) years thereafter; five (5) members, one residing in each of the five County Commission districts, shall be elected by the voters of Sarasota County at the general election to be held in 1984, and every four (4) year thereafter. Members shall take office on the second Tuesday following the general election."
"Section 2.11.B Purpose, Jurisdiction and Meetings of Review Board. The Charter Review board shall hold meetings to organize, elect officers, and conduct business only during the year, and prior to that time, in which a general election is held in 1988, and each four (4) years thereafter. The Review Board shall review the operation of the County government, on behalf of the citizens and recommend changes for improvement of this Charter. Such recommendations shall be subject to referendum in accordance with the provisions of Section 6 herein. An affirmative vote of two-thirds [] of the members elected or appointed to the Review Board shall be required to recommend amendments for referendum. The Board of County Commissioners shall pay reasonable expenses of the charter review Board."
YES (Punch Card Number) NO (Punch Card Number)
Wadhams, 567 So.2d at 415.
[33] See also James Bacchus, Legislative Efforts to Amend the Florida Constitution: The Implications of Smathers v. Smith, 5 Fla. St. U.L.Rev. 747, 802 (1977) ("It is hardly necessary to document the conclusion that a constitution which relies exclusively on legislative journals and legal advertisements to publicize proposed constitutional amendments guarantees little in the way of actual notice to a vast majority of the electorate.").
[34] As noted above, the ballot title and summary indicated that the amendment would foster the rights of Florida citizens through the rulings of the United States Supreme Court.
[35] As noted above, the ballot title and summary claim to "preserve" the death penalty, when the text in fact "authorizes" it. Also, the summary refers to the prohibition against "cruel and/or unusual" punishment, when in fact no such phrase is mentioned in the text. Finally, the ballot title and summary do not mention the fact that the amendment would change the word "or" in the phrase "cruel or unusual" to the word "and."
[36] See, e.g., Traylor, 596 So.2d at 963 ("Special vigilance is required where the fundamental rights of Florida citizens ... are concerned....").
[37] Art. XI, § 5(a), Fla. Const.
[38] Id. § 5(b).
[39] Id. § 5(c).
[40] Interestingly, however, one of the apparent purposes of the amendment, which was to ensure that if electrocution was declared unconstitutional as a method of execution that no death sentence would become invalid, has become moot. The Legislature enacted lethal injection into law and when this Court unanimously upheld the constitutionality of the Legislature's decision to switch to lethal injection without invalidating any existing death penalty, we did not rely on our state constitution. See Sims v. State, 754 So.2d 657, 663 n. 10 (Fla.2000) (concluding that "[i]n light of our holding that the new law may constitutionally apply to Sims, we need not determine the applicability of the 1998 amendments to article I, section 17 of the constitution.").
[41] Although this Court declined to exercise its mandamus jurisdiction, I note that this Court has clearly stated that the procedure the petitioners chosea mandamus petition in this Courthas explicitly been approved of by this Court. See Florida League of Cities v. Smith, 607 So.2d 397, 399 (Fla.1992) ("[O]ur precedent clearly holds that a petition for mandamus is an appropriate method for challenging an allegedly defective proposed amendment to the Constitution."). In hindsight, it now appears that it was inadvisable of this Court to decline to exercise its mandamus jurisdiction in this case at that time.
[42] Certainly, there is some question as to the proper procedure for raising these types of challenges as is evident by our own Court's prior opinions. In the past, these cases have been brought to this Court in a variety of ways. See e.g., Florida League of Cities v. Smith, 607 So.2d 397 (Fla.1992) (original mandamus petition in Florida Supreme Court); Grose v. Firestone, 422 So.2d 303, 304 (Fla.1982) (request for preliminary injunction in the trial court and certified question to Florida Supreme Court); Askew v. Firestone, 421 So.2d 151, 154 (Fla.1982) (suit seeking injunctive and declaratory relief in the trial court and certified question to Florida Supreme Court); Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892, 894 (1944) (habeas corpus proceeding in the trial court and appeal to the Florida Supreme Court). The number of different ways in which these claims have been raised further shows the need for uniformity in not only the timing of these ballot summary challenges, but also uniformity in the procedures to be followed in these challenges in order to facilitate review in this Court and provide for expedited review.
[43] I also disagree with the majority's finding that petitioner was not dilatory in bringing this action. This proposed amendment was adopted in the general election on November 3, 1998. Petitioner first filed this action on October 9, which was three and a half weeks prior to the election and five months after legislative officers on May 5 signed their joint resolution and filed the proposed amendment with the Secretary of State.

Certainly, article XI, section 5, is not intended to provide a time period within which a citizen can challenge an amendment's placement on a statewide ballot. That provision clearly exists for the purpose of having the amendment published and available for complete reading prior to the election. The majority's interpretation seems to legitimize last-minute litigation which throws ballots into chaos.
[44] Article XI, section 1 of the Florida Constitution provides in relevant part:

Proposal by legislature.Amendment of a section or revision of one or more articles, or the whole, of this constitution may be proposed by joint resolution agreed to by three-fifths of the membership of each house of the legislature.
[45] Article I, section 5 of the Florida Constitution provides procedures for submitting a proposed constitutional amendment to the voters of the State of Florida.
[46] Obviously, "accuracy" is a necessary goal to be striven for on all ballots. However, I cannot agree that there is any language in article XI, section 5, that gives the Court the power to make subjective judgments as to whether language appearing on a ballot is "misleading" for the purposes of assuring accuracy. The present majority opinion appears to concede there is no express constitutional basis for this by saying that this is "implicit in this provision."
[47] In its footnote 19, the majority references other cases. A review of these cases demonstrates that in not a single one did this Court strike from the ballot a legislatively initiated amendment on the basis that the ballot summary adopted by the Legislature was "misleading" or in violation of a statute.
[48] James Bacchus, Legislative Efforts to Amend the Florida Constitution: The Implications of Smathers v. Smith, 5 Fla. St. U.L.Rev. 747 (1977) (hereinafter Bacchus). Bacchus was an aide to Governor Reubin O'D. Askew during the events described in this law review article. Thereafter, he was a member of the United States House of Representatives. Bacchus is now Managing Shareholder in the Orlando office of the law firm of Greenberg Traurig and is also a member of the Appellate Body of the World Trade Organization in Geneva, Switzerland.

In its footnote 15, the majority acknowledges Bacchus' conclusion "decrying the lack of adequate judicial control over legislatively proposed amendments and calling for adoption of an explicit accuracy requirement in article XI, section 1", but then the majority proceeds to assume judicial control even though the Constitution has not been changed.
[49] In its footnote 18, the majority attempts to explain this express difference between judicial control over citizen initiatives and legislative amendments on another basis, which simply does not comport with this obvious reason explained in Fine. The reasoning in Fine supports the logic of my conclusions.
[50] See Ray v. Mortham, 742 So.2d 1276 (Fla. 1999); Garvin v. Jerome, No. SC94751 (Fla. notice filed Jan. 22, 1999).
[51] Justice Overton announced this philosophy on repeated occasions: Advisory Op. to the Att'y Gen. re Tax Limitation, 644 So.2d 486 (Fla.1994) (Overton, J., concurring); Florida League of Cities v. Smith, 607 So.2d 397 (Fla.1992)(Overton, dissenting); Evans v. Firestone, 457 So.2d 1351 (Fla.1984)(Overton, J., concurring); Askew v. Firestone, 421 So.2d 151 (Fla.1982)(Overton, J., concurring).