338 So.2d 825 (1976)
Bruce A. SMATHERS, Etc., Appellant,
v.
Chesterfield SMITH, Etc., Appellee.
Nos. 50288 and 50302.
Supreme Court of Florida.
October 11, 1976.
*826 Robert L. Shevin, Atty. Gen., and William C. Sherrill, Jr., Asst. Atty. Gen., for appellant.
Warren M. Goodrich, Bradenton, and William H. McBride, Jr., of Holland & Knight, Tallahassee, for appellee.
Paul W. Lambert, D. Stephen Kahn and Sally G. Munroe, Tallahassee, for intervenors.
Arthur C. Canaday, Tallahassee, Allan Milledge, Coconut Grove, and Daniel W. O'Connell, Tallahassee, for amicus curiae.
ENGLAND, Justice.
We have before us a challenge to a proposed constitutional amendment which was adopted by joint resolution of the 1976 Florida Legislature for submission to the people of the state on November 2, 1976. Chesterfield Smith, a citizen, taxpayer and elector of the State of Florida, brought suit in the Leon County Circuit Court seeking to enjoin the Secretary of State from expending state funds and otherwise acting to submit the amendment to the voters at the general election on that date. Select legislators were permitted to intervene for the purpose of presenting legal arguments to the circuit court. That court granted Smith's motion for summary judgment and enjoined the Secretary of State from submitting the amendment to the voters. Pursuant to Article V, Section 3(b)(1) of the Florida Constitution, an appeal was brought here by the Attorney General on behalf of the state. We reverse the trial court's order.
By Senate Joint Resolutions 619 and 1398, the 1976 Legislature proposed an amendment to Section 18 of the Florida Constitution's Declaration of Rights (Article I) which would add the underscored language and cause that section to read:
"SECTION 18. Administrative penalties.  No administrative agency shall impose a sentence of imprisonment, nor shall it impose any other penalty except as provided by law. Any administrative rule of any agency of the executive branch may be nullified by concurrent resolution of the Legislature on the ground that the rule is without or in excess of delegated legislative authority and may be suspended as provided by law on the same ground; however, by a majority vote of the governor and cabinet the suspension may be deferred until acted upon by the Legislature. Failure of the Legislature to disapprove the suspension at the next regular session shall automatically reinstate the rule."
Smith asserts several reasons why the proposed amendment is improper. He suggests that its language is unclear, its meaning obscure and its purpose too vague; that the Legislature lacks power to propose as a constitutional amendment a revision of governmental powers as sweeping and broad as he contends this amendment contains; that the amendment would violate the "one person-one vote" guarantee of the Fourteenth Amendment of the United States Constitution; that the notice of the contents of the amendment which would appear on the ballot violates Section 101.161, Florida Statutes (1975); and that the amendment is inadequate to inform the public of the substantial shift in governmental power which it would effect. Smith also contends that the amendment in reality alters the separation of powers guaranteed in Article II, Section 3 of the Florida Constitution, in that it gives to the Legislature authority to exercise an interpretive power previously reposed exclusively in the judiciary.
The Attorney General, of course, refutes all of Smith's contentions, and further suggests that the defects alleged are in any event not the proper subject for judicial intervention at this stage. This admonition cannot be ignored, and we approach the subject matter of the case mindful of our limited role in reviewing constitutional proposals which have been adopted by the Legislature for direct submission to the people.
"Another thing we should keep in mind is that we are dealing with a constitutional democracy in which sovereignty resides in the people. It is their Constitution that we are construing. They have a right to change, abrogate or modify it in any manner they see fit so long as they keep *827 within the confines of the Federal Constitution. The legislature which approved and submitted the proposed amendment took the same oath to protect and defend the Constitution that we did and our first duty is to uphold their action if there is any reasonable theory under which it can be done. This is the first rule we are required to observe when considering acts of the legislature and it is even more impelling when considering a proposed constitutional amendment which goes to the people for their approval or disapproval."[1]
It is in that framework that we limit our discussion to the critical issue which is here presented by the parties, and we rest our decision solely on the question of whether the amendment was proposed by the Legislature in conformity with Article XI, Section 1 of the Constitution.[2] That section provides:
"Amendment of a section or revision of one or more articles, or the whole, of this constitution may be proposed by joint resolution agreed to by three-fifths of the membership of each house of the legislature. The full text of the joint resolution and the vote of each member voting shall be entered on the journal of each house."
Because there is doubt as to whether the Legislature has violated what appear to be strictures on their amendatory powers, we are compelled to sustain this legislative action.
The Constitution of Florida is a document of limitation by which the people of the state have restricted the forces of government in the exercise of dominion and power over their property, their rights and their lives.[3] In this document the people have provided a scheme for its periodic modification involving four alternatives. In construing any provision of the Constitution this Court is obliged to consider the document as a whole in order to effect its overall purpose.[4] This fundamental rule of construction directs that we consider the four methods of modifying the Constitution in a way which will harmonize them rather than distort them.
The alternatives for amendment are set out in Article XI. First, the people can by initiative amend any "portion or portions" of the Constitution in any way that they see fit, provided that the amendment brought to vote by an initiative petition confines itself to a single subject matter.[5] Second, the people have reserved the power to call a constitutional convention to consider a revision of their "entire" Constitution.[6] Third, they have directed that a constitutional revision commission be convened at regular intervals to propose a "revision" of the Constitution or any "part", if any be thought desirable, for submission to the voters.[7] *828 These alternatives are not in any way affected by our decision today.
A fourth method for revising or amending the Constitution, which is the one involved here, permits the Legislature to propose an "amendment of a section or revision of one or more articles, or the whole" of the Constitution, at any time. It is immediately apparent that two of three amendatory alternatives given the Legislature  that of amending a "section" and revising an "article"  are tied to locational specificity. No similar limitations are placed on the amendatory rights which the people reserved to themselves.[8] Initially, then, we must decide whether this distinguishing feature of the amendatory authority given the Legislature has legal significance.
We have consistently held that different words in amendatory articles of the Constitution must be read differently, and each given vitality. Adams v. Gunter, 238 So.2d 824 (Fla. 1970); Crawford v. Gilchrist, 64 Fla. 41, 54, 59 So. 963, 968 (1912). The state does not quarrel with this proposition as a general matter, but it argues that it has no place here and that the characterizations in Section 1 are irrelevant because, having been granted three choices by express grant, the Legislature can frame by any name whatever would be valid under any one of them. To limit the Legislature in an attempt to do one when the same objective would have been permissible by an alternative method, we are told, is to elevate form (or semantics) over substance. While this suggestion seems plausible enough, it may overlook too much.
For one thing, if an article revision or a rewrite of the whole Constitution could be characterized, equated with or disguised as a mere section amendment, then the people's deliberate choice of terms is wholly without significance.[9] Every proposal could be defended as a revision of the whole Constitution, no matter how narrow its purpose or subject matter. A fault with the state's suggestion, then, is that it seeks total nullification of two of three amendment procedures the people have given to the legislative branch. We, of course, lack judicial authority to rewrite Section 1 of Article XI as the state seems to request.
Another fault in the state's assertion is that it ignores a very real significance for having three locational limitations on legislative action. The deliberative processes of the Legislature are surrounded by guarantees that the duly elected representatives of the people will know what they are doing when they act in their law-making role. Our Constitution limits their law-making to one subject matter at a time[10] and it requires three separate considerations of each proposed law.[11] These are notice-giving requirements designed to assure knowledgeable law-giving. The state's suggestion that a proposed section amendment may in reality effect a revision of the entire Constitution completely ignores the even more compelling notice-giving needs which legislators should have for constitutional amendments.[12]
Another fault in the state's position is that we cannot treat as merely linguistic distinctions the two site limitations on amendment power which the state would have us abrogate  "section" amendments and "article" revisions  because the locational function of each has a distinctive and unique substantive role in our constitutional scheme.
*829 The function of a section amendment is to alter, modify or change[13] the substance of a single section of the Constitution containing particularized statements of organic law. For example, the initiative power in Section 3 of Article XI serves a substantively particularized role which differs from that of constitutional conventions convened under Section 4 of the same article. The function of an article revision is to restructure an entire class of governmental powers or rights, such as legislative powers, taxation powers, or individual rights. When the subject matter being proposed for change goes beyond or is unrelated to the context of the section it purports to change, the proposal cannot be a section amendment. It may be an article revision or a revision of the whole document, but it is not a "section" amendment. The serious business of amending a constitution by lawmakers demands that the functional unity of sections and articles be preserved to the fullest extent possible, so that, first, ambiguities and contradictions be avoided and, second, cumulative confusion be prevented.[14] That the people of Florida have recognized the dangers of mis-amendments and expressed their intention to avoid their proliferation is manifest in their mandate for revision commissions on a regular, periodic basis. Their concerns in this regard dovetail naturally with the notion that lawmakers who are asked to consider constitutional changes, and the people who are asked to approve them, must be able to comprehend the sweep of each proposal from a fair notification in the proposition itself that it is neither less nor more extensive than it appears to be.
With these minimal requirements for clear expression and locational specificity in mind, we turn to the proposal before us. The Legislature in Senate Joint Resolutions 619 and 1398 chose to amend a "section" of the Constitution by an amendment which, by the barest margin of relevance, would change, alter or improve the provision it purports to amend. Its subject matter is characterized by the Attorney General in his brief as providing
"legislative overview of executive rules to insure compliance with legislative intent."
The provision it purports to amend appears in the Declaration of Rights amid a panoply of protections erected to shield individuals from the abuses of governmental tyranny.[15] The limitation on administrative agency penalties has some connection, albeit tenuous, with the sentence now added to allow the Legislature to protect the citizenry from executive branch over-reaching. The functional relevance of one to the other (though minimal) being established, our inquiry of necessity is curtailed. This casual placement of an amendment in the Constitution reaches the outer limit of legislative authority as conferred by the people in Article XI, Section 1.[16] Put in other terms, the amendment approaches the borderline of "germanity" to the provision it amends.
*830 Inherent in the amendatory process for the Constitution, by necessary implication, is the same notion of "germaneness" which controls the exercise of amendatory powers for general legislation. In its law-making process the Legislature is bound by standards of "germanity" for amendments to all legislation.[17] A concept of germanity, or rationality, for constitutional amendments is clearly essential "to accomplish harmony in language and purpose between articles and to produce as nearly as possible a document free of doubts and inconsistencies."[18] Were this not so, or were Article XI, Section 1 so elastic as to sanction the addition of wholly unrelated provisions to guarantees of individual liberty, then the rationality of the entire 1968 Constitution would be endangered. The Legislature would be free, for example, to amend Article II, Section 2, relating to the seat of government, with proposals to abolish the cabinet system of Florida government and to expand the length of legislative sessions. Both of these "subjects" are mentioned in that section with only slightly less pertinence than the mention of administrative agencies in Section 18 of the Declaration of Rights. Both the cabinet and the 60 day limit on legislative sessions, however, are expressly addressed elsewhere in the Constitution.[19] The controls exercisable by the Legislature to insure executive adherence to legislative directives, on the other hand, are merely implied from other provisions in the Constitution.[20]
No persuasive reason has been suggested for permitting wholly random placements of constitutional provisions by legislative amendment. It is not neatness with which the subject of germaneness is concerned; it is respect for the people's declaration that our organic law shall be free from the confusion and uncertainty in operation which inevitably attend constitutional inconsistencies and ambiguities.[21] The Legislature itself was the first to realize the constitutional requirement of germanity. The notion does not originate here. In its manual of precedents, under the caption "Amendments; Germane", the House of Representatives demonstrates that a section amendment for the Constitution is to be treated as a different species of proposal than an article revision.[22] We here acknowledge *831 the constitutional significance of what that chamber already requires.
*832 These are serious concerns. We have always required the Legislature to meet the precise limitations which circumscribe legislative amendment powers.
"The people of the state have a right to amend their Constitution, and they also have a right to require proposed amendments to be agreed to and submitted for adoption in the manner prescribed by the existing Constitution, which is the fundamental law. If essential mandatory provisions of the organic law are ignored in amending the Constitution of the state, and vital elements of a valid amendment are omitted, it violates the right of all the people of the state to government regulated by law. It is the duty of the courts in authorized proceedings to give effect to the existing Constitution. The proposal of amendments to the Constitution is a highly important function of government that should be performed with the greatest certainty, efficiency, care, and deliberation."[23]
We find ourselves obliged to approve the placement of this amendment on the November ballot only because there exists a reasonable basis to view the new sentence as germane to the provision it amends. If the amendment should be adopted by the voters, it may then become our responsibility, in an appropriate case, to harmonize its reach and meaning with other provisions of the Constitution. To attempt at this time an interpretation of the proposal as it relates to other constitutional provisions would be premature.[24]
We have thoroughly analyzed the alleged constitutional defects and find them insufficient as a matter of law to authorize our interdiction. The decree appealed from is reversed, and the injunction against the Secretary of State is dissolved.
It is so ordered.
OVERTON, C.J., and ROBERTS, ADKINS, SUNDBERG and HATCHETT, JJ., concur.
BOYD, J., concurs specially with opinion.
BOYD, Justice (concurring specially).
I concur in all aspects with the majority opinion except that portion approving the majority view in Adams v. Gunter, 238 So.2d 824 (Fla. 1970), to which I dissented. I still feel that the people should have been permitted to vote upon the question of whether to adopt a unicameral Legislature.
Strong and logical legal reasons have been asserted by the litigants in this proceeding as to whether this proposed Amendment embraces too many topics to be considered in a single amendment. Recognizing the merit in both positions, it is my opinion that the doubt should be resolved in favor of permitting the people to vote on the matter. Courts should not restrict the people from expressing their views through the ballot, except in those cases in which the questions presented are clearly prohibited by the Constitution.
In truly democratic nations violent revolutions are prevented by permitting the people to determine the structure and direction of government by popular vote.
The proposed Amendment has been attacked as violative of the separation of powers doctrine in that the Amendment, if adopted, would permit the Legislature to encroach upon the executive branch of government. Since there is no prohibition against such procedure in the federal Constitution, the people have an inherent right to take power from one branch of government and give it to another.
The last sentence in the proposed Amendment provides as follows:
"Failure of the Legislature to disapprove the suspension at the next regular session shall automatically reinstate the rule."
Obviously, this language is vague and ambiguous and will require subsequent judicial interpretation, should the Amendment be adopted. The inherent right of the people to adopt amendments to the Constitution permit them to adopt vague and ambiguous amendments, as well as those which are easily understood.
NOTES
[1] Gray v. Golden, 89 So.2d 785, 790 (Fla. 1956).
[2] A decision from this Court must be rendered promptly or the machinery of government will be seriously impaired. We are told that the Secretary of State must print and distribute ballots respecting proposed constitutional amendments not later than October 11, 1976, and obviously must know whether this proposed constitutional amendment is to be included on or excluded from those ballots. On September 23, the trial court rendered its decision enjoining the submission of this proposal to the voters, and the appeal was prosecuted here on an expedited basis. Jurisdiction was temporarily relinquished for the purpose of allowing the circuit court to enter an amended order, which was done on September 29. Briefs were submitted by all parties by October 1, and we heard oral argument October 5. These circumstances necessarily limit both our deliberative and our opinion-writing time. We have considered all of the points raised by Smith and find that, other than the one discussed above, they are without merit and not sufficient to warrant discussion in the time we have available.
[3] See Preamble and Art. I, § 1, Fla. Const.
[4] See, for example, Barrow v. Holland, 125 So.2d 749 (Fla. 1960); Scarborough v. Webb's Cut Rate Drug Co., 150 Fla. 754, 8 So.2d 913 (1942); Wheeler v. Meggs, 75 Fla. 687, 78 So. 685 (1918).
[5] Art. XI, § 3, Fla. Const. And see Weber v. Smathers, 338 So.2d 819 (Fla. 1976).
[6] Art. XI, § 4, Fla. Const.
[7] Art. XI, § 2, Fla. Const. The Constitution provides for a constitutional revision commission ten years after initial adoption, in 1978, and thereafter at twenty year intervals.
[8] A locational limit had been placed on the right of initiative in 1968, limiting amendments to "any section." Following our decision in Adams v. Gunter, 238 So.2d 824 (Fla. 1970), that restriction was removed altogether. See Weber v. Smathers, 338 So.2d 819 (Fla. 1976).
[9] The distinction between an "amendment" and a "revision" which was developed in detail in Adams v. Gunter, 238 So.2d 824 (Fla. 1970), is not critical here. It shows, however, our great reluctance to write out or blur distinctive constitutional terminology.
[10] Art. III, § 6, Fla. Const.
[11] Art. III, § 7, Fla. Const.
[12] Unlike mere legislation there is no executive "check" for errors, omissions and inconsistencies. See Art. III, § 8, Fla. Const.
[13] An "amendment" is "a modification or alteration", a "change", or "any writing made or proposed as an improvement of some principal writing." Black's Law Dictionary, 106 (4th Rev.Ed. 1968).
[14] Our much-amended 1885 Constitution was fully revised in 1968 principally because a hodgepodge of disharmonious provisions which had been added over the years had made governance complex, expensive and uncertain.
[15] For example, Sections 11 through 22 of Article 1, respectively, bar imprisonment for debt, bar unreasonable searches and seizures, preserve the writ of habeas corpus, guarantee bail for certain offenses, guarantee a grand jury for capital crimes, preserve rights of an accused to confrontation, counsel, etc., prohibit cruel and unusual punishments, prohibit imprisonment by administrative agencies, prohibit pre-conviction criminal cost payments, limit treasonable offenses and prosecutions, insure prompt justice and access to courts, and preserve the right to trial by jury. See text accompanying n. 4 above regarding our obligation to construe Article I as an harmonious whole.
[16] Contrast, for example, as well within the ambit of legislative power, a proposal on the November ballot to amend Section 12 of Article V, altering by various inclusions and exclusions the procedures affecting the discipline and removal of judges and justices. This "section" amendment was also adopted by the 1976 Legislature.
[17] State ex rel. Oglesby v. Hand, 96 Fla. 799, 119 So. 376 (1928); Art. III, § 6, Fla. Const.
[18] Adams v. Gunter, 238 So.2d 824, 829 (Fla. 1970). The same notion of germanity would pertain to article revisions, for the same reason. Constitutional adjustments of more-than-article significance, however, pose no need for germanity since they are necessarily revisions to the entire Constitution.
[19] Art. IV, § 4 and Art. III, § 3(d), Fla. Const.
[20] See Art. III, § 12 and Art. IV, § 6, Fla. Const.
[21] The state's position would also accommodate the placement of random and unrelated provisions without even the appearance of a nexus. Arguing from its view it would necessarily follow that an article revision, just as a section amendment, need not have topical rationality to fall within the Legislature's ambit of power. The internal germanity of a proposed article revision stands on no different ground than an article revision which adds irrelevant material to an existing provision. Under this view of Article XI, Section 1, there would be nothing to bar the Legislature from proposing a single amendment which in one section or article would establish unicameralism, prohibit forced busing of school children, and bar all forms of taxation on corporate entities formed or domesticated in Florida. Such an aggregation of dissimilar provisions, each individually attractive to a different segment of voters, would exceed legislative power as a section amendment or article revision, being frought with the very evil this Court identified and condemned as to statutory "logrolling" in Colonial Inv. Co. v. Nolan, 100 Fla. 1349, 131 So. 178 (1930).
[22] See Precedents In the Florida House of Representatives (1975) at 148-49, quoting from Fla.H.R.Jour. (April 9, 1970) at p. 97:

"HJR 59 which proposed an amendment to § 2, Article VI, of the State Constitution was pending on an amendment and a substitute amendment.
Representative Reed offered an amendment to the substitute amendment which added a new section amending § 15, Article III.
Mr. Lewis, by point of order, questioned the applicability of the amendment on the ground that Mr. Reed sought to amend a section of the Constitution other than the section in the House Joint Resolution under consideration.
Mr. Reed agreed he was seeking to amend another section of the Constitution but argued this was permissible under Article XI, § 1, of the Constitution as Revised in 1968. The Chair (E.C. Rowell) ruled the amendment by Mr. Reed out of order as not being germane to the matter under debate.
THE SPEAKER IN THE CHAIR
Mr. Reed asked the Chair to revisit its ruling, again stating his belief that the revised Constitution permitted the grouping in a joint resolution of matters touching several articles. He said this was what actually had been done in submitting the revised Constitution to the electorate in 1968.
The Speaker (Frederick H. Schultz) reiterated the Chair's ruling that Mr. Reed's amendment was out of order on the following basis: `the section of the Constitution reads, "Amendment of a section, or revision of one or more articles of (sic) the whole of this Constitution ..." This is not a revision; this is purely the amendment of a section, and therefore your amendment would not be germane in this particular instance.' Mr. Reed insisted the Constitution should be read in its broadest possible fashion in order to ascribe to it the interpretation which he believed to be the intent of the drafters of Section I of Article XI, and that was that any section, or any portion of a section, or any article, could be revised, amended, or changed by the use of one resolution.
The Speaker said he agreed with Mr. Reed `on the question of a revision of one or more articles. My ruling is based on the fact that this is not a revision of an article. It is the amendment of a section.' The Speaker again ruled Mr. Reed's amendment out of order."
See also, Precedent 11.7(al), id. at 165, ruling out of order an amendment within the same article but not the same section of the Constitution.
[23] Crawford v. Gilchrist, 64 Fla. 41, 53-54, 59 So. 963, 967-968 (1912).
[24] We note, however, the state's assertion in its brief that "the courts have the final say in the interpretation of the constitution... . The Legislature did not intend to change this fundamental rule... . The amendment authorizes the legislature to determine if the rule is `in excess or without legislative authority,' but since this would be a constitutional standard, the courts would have the final word as to whether the rule indeed is in excess or without legislative authority." In like vein the legislator-intervenors state "[t]he courts will have the ultimate authority to pass on whether an agency rule is without or in excess of delegated legislative authority." We further note that the statute establishing the suspension procedure, which was vetoed by the Governor, is not in issue in these proceedings, and by recognizing the propriety of this amendment to be on the ballot we neither approve nor disapprove any statutory scheme for suspension. Lastly, we note that the power of a legislative committee to suspend agency rules is likewise a premature issue at this time.