880 So.2d 675 (2004)
ADVISORY OPINION TO THE ATTORNEY GENERAL RE THE MEDICAL LIABILITY CLAIMANT'S COMPENSATION AMENDMENT.
No. SC04-310.
Supreme Court of Florida.
July 15, 2004.
Charles J. Crist, Jr., Attorney General and Louis F. Hubener, Chief Deputy Solicitor General, Tallahassee, FL, for Petitioner.
Stephen H. Grimes and Susan L. Kelsey of Holland and Knight, LLP, Tallahassee, *676 FL, for Citizens For a Fair Share, Inc., Proponents.
Timothy McLendon and Jon Mills, Gainesville, Florida and Barnaby W. Zall of Weinberg and Jacobs, LLP, Rockville, Maryland, on behalf of Floridians for Patient Protection; and Arthur I. Jacobs and Lisa G. Satcher of Jacobs and Associates, P.A., Fernandina Beach, FL on behalf of Trial Lawyers Section of the Florida Bar, for Opponents.
PER CURIAM.
The Attorney General has requested this Court to review a proposed amendment to the Florida Constitution that would limit the contingency fee agreement between injured claimants and their attorneys in medical liability cases. We have jurisdiction. See art. IV, § 10; art V, § 3(b)(10), Fla. Const. For the reasons explained below, we approve the amendment and the ballot title and summary for placement on the ballot.

THE PROPOSED AMENDMENT AND BALLOT SUMMARY
The ballot title for the proposed amendment is "The Medical Liability Claimant's Compensation Amendment." The summary for the proposed amendment provides:
Proposes to amend the State Constitution to provide that an injured claimant who enters into a contingency fee agreement with an attorney in a claim for medical liability is entitled to no less than 70% of the first $250,000.00 in all damages received by the claimant, and 90% of damages in excess of $250,000.00, exclusive of reasonable and customary costs and regardless of the number of defendants. This amendment is intended to be self-executing.
The full text of the proposed amendment reads as follows:
Section 1.
Article 1, Section 26 is created to read "Claimant's right to fair compensation."
In any medical liability claim involving a contingency fee, the claimant is entitled to receive no less than 70% of the first $250,000.00 in all damages received by the claimant, exclusive of reasonable and customary costs, whether received by judgment, settlement, or otherwise, and regardless of the number of defendants. The claimant is entitled to 90% of all damages in excess of $250,000.00, exclusive of reasonable and customary costs and regardless of the number of defendants. This provision is self-executing and does not require implementing legislation.
Section 2.
This Amendment shall take effect on the day following approval by the voters.

STANDARD AND SCOPE OF REVIEW
In Advisory Opinion to the Attorney General re Amendment to Bar Government from Treating People Differently Based on Race in Public Education, 778 So.2d 888 (Fla.2000), this Court summarized its standard of review in initiative petition cases:
The Court's inquiry, when determining the validity of initiative petitions, is limited to two legal issues: whether the petition satisfies the single-subject requirement of article XI, section 3, Florida Constitution, and whether the ballot titles and summaries are printed in clear and unambiguous language pursuant to section 101.161, Florida Statutes (1999). In order for the Court to invalidate a proposed amendment, the record must show that the proposal is clearly and conclusively defective on either ground. In determining the propriety of the initiative *677 petitions, the Court does not review the merits of the proposed amendments.
Id. at 890-91 (citations omitted).

SINGLE-SUBJECT REQUIREMENT
Article XI, section 3 of the Florida Constitution provides in pertinent part that proposed amendments based on citizen initiative petitions "shall embrace but one subject and matter directly connected therewith." This Court has held that the single-subject requirement serves the following purposes: (1) it prevents "logrolling," a practice that combines separate issues into a single proposal to secure passage of an unpopular issue; and (2) it "prevent[s] a single constitutional amendment from substantially altering or performing the functions of multiple aspects of government." Advisory Opinion to the Attorney Gen. re Florida Transp. Initiative for Statewide High Speed Monorail, Fixed Guideway or Magnetic Levitation Sys., 769 So.2d 367, 369 (Fla.2000). A proposed amendment must manifest a "logical and natural oneness of purpose" in order to satisfy the single-subject requirement. Fine v. Firestone, 448 So.2d 984, 990 (Fla.1984). This determination requires the Court to consider whether the proposed amendment affects separate functions of government, as well as how it affects other provisions of the constitution. See In re Advisory Opinion to the Attorney Gen.-Restricts Laws Related to Discrimination, 632 So.2d 1018, 1020 (Fla.1994).
The amendment's opponents assert that the proposed amendment would have a "precipitous" and "cataclysmic" effect on multiple branches of state government. The opponents argue that the amendment therefore improperly affects separate functions of government and portions of the Florida Constitution. Specifically, the opponents allege that the amendment's ambiguous wording will impact the judiciary's involvement in regulating attorneys and the fees they charge.
While we find the proposed amendment at bar to be extremely brief, we also find its language to be straightforward as to who it affects or who is involved in its implementation. See Advisory Opinion to the Attorney Gen. re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 565-66 (Fla.1998) ("[I]t is imperative that an initiative identify the provisions of the constitution substantially affected by the proposed amendment in order for the public to fully comprehend the contemplated changes and to ensure that the initiative's effect on other unnamed provisions is not left unresolved and open to various interpretations."). We agree that the amendment does relate to the judicial branch because at the very least, the amendment would functionally override or interfere with the Rules of Professional Conduct as they relate to fee contracts between attorneys and their clients. See R. Regulating Fla. Bar 4-1.5. However, beyond the aforementioned effect, the amendment does not substantially alter or perform the functions of multiple branches of government or the constitution. Further, to expand our consideration to the merits of the amendment would go beyond this Court's scope in giving proposed amendment advisory opinions. See In re Advisory Opinion to Attorney General ex rel. Authorizes Miami Dade And Broward County Voters To Approve Slot Machines In Parimutuel Facilities, 880 So.2d 522, 523, 2004 WL 1064930 (Fla. May 13, 2004) ("[T]he Court does not review the merits or the wisdom of the proposed amendment.").
We likewise find no merit in the arguments that the amendment should be stricken from the ballot on the basis that it *678 violates the single-subject requirement because the Judiciary and the Legislature would be burdened with having to interpret and define the amendment's terms. The proposed amendment has a limited scope because it involves contractual fee agreements between attorneys and clients, which do not inherently involve the executive or legislative branches.
Although the proposed amendment logically relates to the judicial branch and could possibly result in some collateral ramifications for the other two branches, the proposal will not substantially alter or perform the functions of those branches. "[T]he possibility that an amendment might interact with other parts of the Florida Constitution is not sufficient reason to invalidate the proposed amendment." Advisory Opinion to the Attorney Gen.Fee on Everglades Sugar Prod., 681 So.2d 1124, 1128 (Fla.1996) (quoting Advisory Opinion to the Attorney Gen. re Limited Casinos, 644 So.2d 71, 74 (Fla.1994)). Likewise, "[a] proposal that affects several branches of government will not automatically fail." Advisory Opinion to Atty. Gen. re Fish & Wildlife Conservation Comm'n, 705 So.2d 1351, 1353-54 (Fla.1998). Rather, "it is when a proposal substantially alters or performs the functions of multiple branches that it violates the single-subject test." Id. at 1354. See also Advisory Opinion To Atty. Gen. re Right to Treatment and Rehabilitation, 818 So.2d 491, 496 (Fla.2002) ("[T]he proposed amendment may `affect' several branches of government but it does not substantially `alter' or `perform' the functions of those branches.").
The opponents also argue that the amendment impermissibly affects portions of the Florida Constitution, specifically article I, sections 2 and 10. See Art. I, § 10, Fla. Const. ("No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed."). However, we are not persuaded by the argument that the amendment affects portions of the Florida Constitution prohibiting the impairment of citizens' contract rights because it does not propose to transcend similar limitations on attorney-client fee arrangements that are currently in place. See R. Regulating Fla. Bar 4-1.5. As previously discussed, the proposed amendment could impact the relevant Rules of Professional Conduct, but it does not appear to otherwise have a wide-reaching impact on other constitutional provisions.
Thus, we conclude that the amendment, as proposed, does not violate the single-subject requirement.

REVIEW OF BALLOT TITLE AND SUMMARY
Section 101.161(1) of the Florida Statutes governs the requirements for ballot titles and summaries and provides, in relevant part:
Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot....
§ 101.161(1), Fla. Stat. (2003). Thus, the statute requires that the ballot title and summary "state in clear and unambiguous language the chief purpose of the measure." Advisory Opinion to the Attorney Gen.Limited Political Terms in Certain Elective Offices, 592 So.2d 225, 228 (Fla.1991); accord Right of Citizens to Choose Health Care Providers, 705 So.2d at 566. Above all, the title and summary must be accurate and informative. See Advisory Opinion to the Attorney Gen. re Term Limits Pledge, 718 So.2d 798, 803 (Fla.1998). These requirements make certain that the "electorate is advised of the true meaning, and ramifications, of an amendment." *679 Advisory Opinion to the Attorney Gen. re Tax Limitation, 644 So.2d 486, 490 (Fla.1994) (quoting Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982)).
This Court has concluded that the purpose of ballot title and summary statute was "to provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot." Term Limits Pledge, 718 So.2d at 803 (quoting Right of Citizens to Choose Health Care Providers, 705 So.2d at 566). In sum, it is this Court's "responsibility... to determine whether the language of the title and summary, as written, misleads the public." Right of Citizens to Choose Health Care Providers, 705 So.2d at 566. "When the summary of a proposed amendment does not accurately describe the scope of the text of the amendment, it fails in its purpose and must be stricken." Term Limits Pledge, 718 So.2d at 804.
In Right of Citizens to Choose Health Care Providers, this Court struck an amendment from the ballot because there were discrepancies between the amendment and the summary that were "material and misleading." 705 So.2d at 566. The Court described such ambiguity as being a "divergence in terminology" and found that it caused the amendment to be "fatally defective." Id. However, in the proposed amendment before us, we do not find material or misleading discrepancies between the summary and the amendment. In fact, the summary in this amendment comes very close to reiterating the briefly worded amendment.
We also note that it is not necessary for the title and summary to explain every detail or ramification of the proposed amendment. See Advisory Opinion to the Attorney Gen. re Prohibiting Public Funding of Political Candidates' Campaigns, 693 So.2d 972, 975 (Fla.1997). Even the terms "claim for medical liability" and "medical liability claim" do not represent a discrepancy between the amendment and summary because those terms are used consistently between the summary and the amendment. Although the opponents argue that the efficacy of the amendment is at issue because of the vague "medical liability" term, the issue as to the precise meaning of this term is better left to subsequent litigation, should the amendment pass. Under the scope of our review, we find the wording of the title and summary sufficient to communicate the chief purpose of the measure. Thus, we conclude that the ballot summary explains the "chief purpose" of the proposed amendment and meets the statutory requirements of section 101.161(1), Florida Statutes.

CONCLUSION
For the reasons stated, we hold that the initiative petition and proposed ballot title and summary for "The Medical Liability Claimant's Compensation Amendment" meet the legal requirements of article XI, section 3 of the Florida Constitution, and section 101.161(1), Florida Statutes (2003). We therefore approve the amendment for placement on the ballot. We note, however, that no other issue is addressed here and this opinion should not be construed as expressing either favor for or opposition to the proposed amendment.
It is so ordered.
PARIENTE, C.J., and WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs with an opinion, in which QUINCE, J., concurs.
LEWIS, J., dissents with an opinion, in which ANSTEAD, J., concurs.
*680 PARIENTE, C.J., concurring.
Although I agree with much of what Justice Lewis says in his dissenting opinion as to the practical effect of this proposed amendment, I conclude that these concerns are beyond the scope of our current review. The chief purpose of an amendment, which must be conveyed in a ballot summary, is distinct from its potential effect or the motivations of the proponents. As I stated in my concurring opinion in Advisory Opinion to the Attorney General re Public Protection From Repeated Medical Malpractice, No. SC04-778, 880 So.2d 667, 674, 2004 WL 1574024 (Fla. July 15, 2004), "our focus in assessing whether a ballot summary conveys the true meaning and ramifications of the amendment has been whether the summary misleads voters into concluding that the amendment would provide greater citizen protection than current law, when in fact it would provide less protection than the Constitution or law currently provided."
The summary in this case does not mislead voters into concluding that they would receive more legal protection than under current law. It says nothing whatsoever concerning greater or lesser protection. It merely guarantees them a particular percentage of their recovery in a medical liability claim. Thus, it does not purport to create a right when in fact it restricts that right, as in cases in which we have disapproved ballot summaries. See, e.g., Advisory Opinion to the Atty. Gen. re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 566 (Fla.1998) ("We also find that the proposed amendment creates an illusory right to choose a health care provider when in fact it would severely limit an individual's ability to enter into a health care contract.").
If approved, the amendment may well hamper citizens' ability to press their medical liability claims because its ceiling on contingency fee percentages would discourage the participation of knowledgeable and experienced counsel. Nonetheless, nothing within the text of the amendment points to that result. The fact that one may reasonably anticipate particular consequences of the amendment does not render a summary that omits these potential consequences misleading as to the current state of the law.
As Justice Lewis has stated, the proponents of this amendment appear to have an ulterior purpose. However, that is not a fatal flaw at this stage of the process. Advocates of a constitutional amendment may have different motives. We cannot say with confidence that all who might favor this amendment and are aware of its potential impact on legal representation would favor its passage solely for that reason. To ascribe one primary motive to advocates of a measure, and then require that this motive be conveyed in a seventy-five word ballot summary, is impractical if not impossible.
I conclude that the task of informing the public as to the possible motivations behind the proposed amendment and its potential practical effects must fall on the proponents and opponents of the measure. The following observations we made in reviewing another summary hold true here:
It is true ... that certain of the details of the [text] as well as some of its ramifications were either omitted from the ballot question or could have been better explained therein. That, however, is not the test. There is no requirement that the referendum question set forth the [text] verbatim nor explain its complete terms at great and undue length. Such would hamper instead of aiding the intelligent exercise of the privilege of voting. Under our system of free elections, *681 the voter must acquaint himself with the details of a proposed ordinance on a referendum together with the pros and cons thereon before he enters the voting booth. If he does not, it is no function of the ballot question to provide him with that needed education. What the law very simply requires is that the ballot give the voter fair notice of the question he must decide so that he may intelligently cast his vote. That requirement has been more than adequately met in this case.
Advisory Opinion to Atty. Gen. re Right to Treatment and Rehabilitation, 818 So.2d 491, 498 (Fla.2002) (quoting Metropolitan Dade County v. Shiver, 365 So.2d 210, 213 (Fla. 3d DCA 1978)).
Accordingly, I concur in the majority's approval of this ballot title and summary for placement on the ballot.
QUINCE, J., concurs.
LEWIS, J., dissenting.
It is well settled that the intent of section 101.161(1) is to ensure that voters are advised of the true meaning and purpose of a proposed constitutional amendment. See Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982). This Court has recognized that "[a] ballot title and summary cannot either `fly under false colors' or `hide the ball' as to the amendment's true effect." Armstrong v. Harris, 773 So.2d 7, 16 (Fla.2000). I must dissent from the majority's holding approving the proposed ballot title and summary in the instant action, as it is clear that the singular and only purpose of this proposed amendment is not as printed, but is instead the unstated ulterior purpose of interfering with the relationship between injured citizens of Florida and representatives they may wish to secure to protect their interests and, as a direct result, impact access to the courts as guaranteed in article I, section 21 of the Florida Constitution.
In Armstrong, this Court considered the following ballot title and summary:
BALLOT TITLE: PRESERVATION OF THE DEATH PENALTY; UNITED STATES SUPREME COURT INTERPRETATION OF CRUEL AND UNUSUAL PUNISHMENT
BALLOT SUMMARY: Proposing an amendment to Section 17 of Article I of the State Constitution preserving the death penalty, and permitting any execution method unless prohibited by the Federal Constitution. Requires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment. Prohibits reduction of a death sentence based on invalidity of execution method, and provides for continued force of sentence. Provides for retroactive applicability.
Armstrong, 773 So.2d at 16. The Court there held that the title and summary were misleading because they implied that the amendment would protect the rights of Florida citizens, when in fact the effect of the amendment would be to nullify rights. See id. at 17-18. This Court held that the ballot title and summary could not "fly under false colors" in such a manner. Moreover, the Court also held that the title and summary "hid the ball" from the voters by asserting that the purpose of the proposed amendment was to "preserve" the death penalty, when the actual purpose was to nullify the Cruel or Unusual Punishment Clause of the Florida Constitution. See id. at 18. As the main target of the proposed amendment was not mentioned in the title and summary, this Court held that the ballot title and summary were defective. See id.[1]
*682 In a similar manner, in Askew, this Court rejected an amendment because a proposed ballot title and summary failed to adequately inform the voters of the amendment's true chief purpose. There, we considered the following ballot title and summary:
FINANCIAL DISCLOSURE REQUIRED BEFORE LOBBYING BY FORMER LEGISLATORS AND STATEWIDE ELECTED OFFICERS. Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, unless they file full and public disclosure of their financial interests.
Askew, 421 So.2d at 153. We held that the title and summary were defective because they neglected to inform the public that the constitution already contained a two-year ban on lobbying, and the proposed amendment would actually abolish that provision. See id. at 155. We reasoned: "[T]he `proposal of amendments to the Constitution is a highly important function of government, that should be performed with the greatest certainty, efficiency, care and deliberation.'" Id. (quoting Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963, 968 (1912)). Further, we emphasized that "lawmakers who are asked to consider constitutional changes, and the people who are asked to approve them, must be able to comprehend the sweep of each proposal from a fair notification in the proposition itself that it is neither less nor more extensive than it appears to be." Id. (quoting Smathers v. Smith, 338 So.2d 825, 829 (Fla.1976)). See also Advisory Op. to the Att'y Gen. re Casino Authorization, Taxation and Regulation, 656 So.2d 466, 469 (Fla.1995) (finding a ballot title and summary misleading because they created the impression that casinos were allowed in Florida and failed to inform voters that most types of casino gaming were actually prohibited by statute).

FALSE PROMISE
The ballot title and summary presented here similarly fail, as they both fly under false colors and attempt to "hide the ball" from the voters and disguise a very clear end. They make false promises of benefits when they really take away and restrict existing rights. The sponsors of the proposed amendment assert that the chief purpose of the amendment is to guarantee that a claimant for medical liability with a contingency fee agreement will receive no less than seventy percent of the first $250,000 in damages and ninety percent of damages in excess of $250,000, exclusive of *683 reasonable and customary costs and regardless of the number of defendants. Clearly, the proposed amendment as written portrays that it will provide protection for citizens by ensuring that they will actually personally receive a deceptive amount of all money determined as damages in any medical liability action. However, the amendment actually has the singular and only purpose of impeding a citizen's access to the courts and that citizen's right and ability to secure representation for a redress of injuries. Its purpose is to restrict a citizen's right to retain counsel of his or her choice on terms chosen by the citizen and selected counsel and to thereby negatively impact the right of Florida citizens to seek redress for injuries sustained by medical malpractice. This is truly a wolf in sheep's clothing.
Pursuant to Florida law, medical negligence actions are currently highly regulated, and, unquestionably, Florida's citizens require the assistance of knowledgeable and experienced attorneys to navigate through the extensive and complicated process. Those attorneys who have worked years to gain expertise in this highly specialized field are certainly entitled to reasonable compensation. If enacted, the proposed amendment will not eliminate the process an injured citizen must follow, but is designed to and will undoubtedly eliminate the willingness of counselors to accept the responsibility for such matters with the economic restrictions imposed.
Prior to filing a legal action, a claimant is required to notify all prospective defendants of the claims. See § 766.106, Fla. Stat. (2003). At times, it is often difficult to initially identify those responsible for clear injuries. Once a claimant has filed notice with the prospective defendants, there are specific time periods and limitations that must be precisely followed before the actual legal action is considered timely filed. See § 766.106, Fla. Stat. (2003). Unlike all other areas of Florida law, our law now mandates that prior to initiating a medical negligence action, a claimant must conduct an entire presuit investigative process as a condition precedent to proceed with any claims. See §§ 766.203-766.206, Fla. Stat. (2003). Failure to follow this required presuit screening process constitutes a basis to defeat any claim even if the claim is absolutely valid and the damages enormous. See § 766.106, Fla. Stat. (2003).
Once an action has been filed, the court may require, upon motion by a health care provider, that the claim be submitted to an arbitration process that is totally nonbinding. See § 766.107, Fla. Stat. (2003). In the alternative, the parties may mutually agree to binding arbitration. See § 766.207, Fla. Stat. (2003). If the parties do not agree to binding arbitration, section 766.108 of the Florida Statutes (2003) requires that the parties participate in mandatory mediation and settlement conference activities prior to any trial. See § 766.108(1)-(2)(a), Fla. Stat. (2003). Clearly, before a claim is ever filed or a trial may begin or damages are awarded, a litigant with a medical negligence claim must proceed through a lengthy, time-consuming, and certainly, costly process. This mandatory pretrial screening process will remain in effect even if the proposed amendment is adopted. Florida citizens need, and are entitled to, assistance to guide them through this process. As evidenced by the numerous decisions concerning the pretrial medical negligence process, the existing law has been a series of traps and a minefield for many Floridians. See, e.g., Goradesky v. Hickox, 721 So.2d 419, 420 (Fla. 4th DCA 1998) (affirming dismissal of claim for failing to file corroborating expert affidavit and failure to conduct reasonable presuit investigation *684 before filing notice of intent); Kukral v. Mekras, 647 So.2d 849, 850-51 (Fla. 3d DCA 1995) (affirming dismissal of claim and holding no reasonable investigation was conducted), quashed, 679 So.2d 278 (Fla.1996); Archer v. Maddux, 645 So.2d 544, 547 (Fla. 1st DCA 1994) (affirming dismissal of claim for failure to provide corroborating expert opinion within statute of limitations). The district courts have recognized that the presuit investigation requirements are "complex and confusing," Coffaro v. Hillsborough County Hosp. Auth., 752 So.2d 712, 713 (Fla. 2d DCA 2000), approved, 829 So.2d 862 (Fla.2002), and that the "interrelationship of [the] tolling and extension periods has produced [a] type of mathematical puzzle." Id. at 714. Further, they have recognized that while the procedures were not designed to function as traps for the litigants, they have nonetheless become just thata trap. See id. at 715; Zacker v. Croft, 609 So.2d 140, 141-42 (Fla. 4th DCA 1992). Unquestionably, without competent counsel, the process is impossible.
It is also vital to note the damage caps which now exist within the medical negligence statutory provisions, which are rarely mentioned but will continue to remain in effect should the proposed amendment be adopted. If the parties agree to binding arbitration pursuant to section 766.207, economic damages, including past and future medical expenses and eighty percent of wage loss[2] and loss of earning capacity can be awarded, offset, however, by collateral source payments. In this process, noneconomic damages are capped at $250,000 with future economic losses available, but they must be paid in periodic installments. Punitive damages are not available no matter how egregious the conduct may be. See § 766.207, Fla. Stat. (2003). If a claimant rejects a medical provider's offer to enter voluntary binding arbitration, the only damages awardable at trial are limited to net economic damages and noneconomic damages are absolutely capped not to exceed $350,000 per incident. See § 766.209, Fla. Stat. (2003).
If the parties proceed to trial, and damages are awarded to a claimant, noneconomic damages for the negligence of practitioners, regardless of the number, are capped at $500,000 per claimant if the negligence resulted in personal injury or wrongful death, and $1 million for all practitioners if the negligence resulted in a permanent vegetative state or death. See § 766.118, Fla. Stat. (2003). Similarly, noneconomic damages for the negligence of nonpractitioners are capped at $750,000 per claimant if the negligence resulted in personal injury or wrongful death, and $1.5 million from all nonpractitioners if the negligence resulted in a permanent vegetative state or death. See § 766.118, Fla. Stat. (2003). Finally, for the negligence of practitioners providing emergency services, noneconomic damages are capped at $150,000 per claimant, and a total claim of $300,000. See § 766.118, Fla. Stat. (2003).[3] All of these seldom discussed damage caps demonstrate that injured claimants are not eligible to receive enormous sums of money even if they are totally correct, suffer *685 the consequences of absolutely clear negligence, and have been egregiously injured. In this highly specialized field, damages are currently artificially limited, and if the proposed amendment is adopted, these damage caps, along with the expensive and time consuming pretrial process, will remain in effect.
Several statutes which relate to the rights of third parties to enforce hospital liens and receive reimbursement or subrogation are also substantially implicated by the enactment of the proposed constitutional amendment. Pursuant to chapter 27032, Laws of Florida (1951), (commonly known as the "Hospital Lien Act") many of Florida's counties have adopted hospital lien acts that entitle hospitals to liens upon all causes of action for all reasonable charges for hospital care, treatment and maintenance. See, e.g., ch. 78-552, Laws of Fla. (Lee County's hospital lien act); ch. 57-1688, Laws of Fla. (Palm Beach County's hospital lien act); ch. 57-1644, Laws of Fla. (Orange County's hospital lien act); ch. 30615, Laws of Fla. (1955) (Broward County's hospital lien act). Additionally, there are both state and federal laws pertaining to the reimbursement of Medicaid and Medicare payments and the right of insurance and health maintenance organizations to be reimbursed for payments to subscribers who suffer injury, disease, or illness by virtue of the negligent act of a third party. See, e.g., 42 U.S.C. § 1395; § 409.910, Fla. Stat. (2003); § 641.31(8), Fla. Stat. (2003). If the proposed amendment is adopted, these provisions for payments to entitled third parties may be impacted, and due to the statutory damage caps, damage awards in some situations may not be sufficient to ensure that all eligible third parties receive full payment after the claimant receives seventy percent of the first $250,000 and ninety percent of all damages over $250,000, as mandated by the amendment. Common law and traditional subrogation rights are also implicated. Most importantly, the true purpose of the proposed amendment is truly revealed in the convergence of the proposed amendment, the unique presuit process, the statutes pertaining to the rights of third parties, and the damage cap statutory provisions. All converge to leave little, if any, funds remaining for Florida citizens to obtain counsel. Without knowledgeable and experienced attorneys to provide representation, the citizens of Florida will have no meaningful access to the courts, and the end result will be that the courthouse door will be open to only those wealthy enough to afford to compensate an attorney on some non-contingency fee basis.

CONCLUSION
As in Armstrong, Askew, and Casino Authorization, Taxation and Regulation, the proposed ballot title and summary here are patently misleading. They promise benefits while taking away important rights. The chief purpose of the proposed amendment is to render it economically impossible for claimants and their legal representatives to proceed with actions to redress legitimate injuries. With the artificial percentages of recovery mandated by the proposed amendment, unquestionably, legal counselors will be unable to accept responsibility for processing medical actions. Due to the complex nature of medical negligence claims, including the requisite statutory screening process, injured citizens will be unable to navigate the field alone. Moreover, health care providers will not be similarly handicapped, as the proposed amendment will in no way impact their rights to retain counsel on any terms or limit the funds available to secure defense counsel.
Every citizen of Florida needs and is entitled to assistance of counsel in all legal *686 matters, particularly in connection with medical negligence actions, and to be free to engage counsel on terms the citizen deems appropriate. The proposed ballot title and summary fly under false colors and hide the ball by completely failing to inform the voters of the actual chief purpose of the proposed amendment, which is to so adversely impact representation in such actions as to eliminate most, if not all, such actions by restricting the terms of any representation agreement between the citizen and selected counsel. Without being informed regarding the current state of the law, voters will unquestionably be unable to comprehend the extensive sweep of the proposed amendment. If the sponsors of this amendment seek to restrict or eliminate medical liability actions involving contingency fee agreements, then they should say exactly that, as mandated by this Court's precedent. They should not falsely claim they are providing a benefit to those injured by medical malpractice when they are in fact restricting their rights to secure adequate legal representation. There really is no other purpose of this proposed amendment. The title and summary are not required to disclose all ramifications, but the purpose must be disclosed. In my view, the proposed ballot title and summary are defective for failing to inform the voters of the true chief purpose of the proposed amendment and, therefore, I must dissent.
ANSTEAD, J., concurs.
NOTES
[1] I must note that although I dissented from the majority's opinion in Armstrong, my dissent was not premised upon Armstrong's admonition that the ballot title and summary must not either "fly under false colors" or "hide the ball" with regard to the amendment's true effect. Instead, I dissented from the Armstrong majority on an entirely separate basis, not at issue here. In my view, this Court's review of the ballot title and summary at issue in Armstrong after the proposed amendment had appeared on the ballot and had been approved by the voters in the general election was untimely. As I expressed in my dissent in Armstrong, there I would have applied the principle of law that:

[O]nce an election has been concluded and the result determined, it is the duty of the judicial system to uphold that result, if possible, if the process has been essentially free and fair, the voters have not been essentially deprived of their right to vote due to the alleged defect, and the result has not been so tainted by irregularities as to suggest that the result is not the intent of the electorate.
Armstrong, 773 So.2d at 33 (Lewis, J., dissenting). Despite my dissent with regard to the procedural posture of Armstrong, I concurred with the views expressed in the majority opinion with respect to "the role of judicial system in connection with proposed constitutional amendments." Id. at 32 (Lewis, J., dissenting).
[2] The Legislature expressly found that "[t]he recovery of 100 percent of economic losses constitutes overcompensation because such recovery fails to recognize that such awards are not subject to taxes on economic damages." § 766.201(1)(e), Fla. Stat. (2003).
[3] It should also be noted that the Legislature has created the Florida Birth-Related Neurological Injury Compensation Plan. The purpose of this plan, as expressed by the Legislature, is to provide compensation, on a no-fault basis, for birth-related neurological injuries. The compensation plan is the exclusive remedy for such injuries, and limits recovery to $100,000. See § 766.303, Fla. Stat. (2003); § 766.31(1)(b)1., Fla. Stat. (2003).